606 A.2d 257

**Ronald E. KIRCHNER**

**v.**

**Kathleen M. CAUGHEY.**

**No. 131, Sept. Term, 1991.**

Court of Appeals of Maryland.

May 13, 1992.

Jan O'Connor and Charles E. Wehland, Ellicott City, for appellant.

Kevin B. Kamenetz (Moore, Libowitz & Thomas, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

The parties to this appeal were divorced in December of 1983, when their only child, Bridgette, was one and one-half years of age. The mother, Kathleen M. Caughey, was granted legal and primary physical custody of the child, and the father was given defined, liberal rights of visitation, all in accordance with an earlier agreement of the parties. Since that time, there have been disagreements between the parties and court proceedings dealing with claims for change of custody and modification of visitation rights.

Until 1990, the parties were generally able to resolve their differences before final court action, and the resulting agreements were approved by the Circuit Court for Baltimore County and incorporated into amendments to the original decree. Throughout this time, the mother retained sole legal custody and primary physical custody of the child, and the father retained and exercised his liberal rights of visitation.

On 23 July 1990, the mother filed a petition seeking an increase in child support, a modification of visitation rights to exclude Sunday visitation, and a request that the father be enjoined "from all efforts to indoctrinate the child in the Baptist religion." The father filed an answer, together with a cross-petition seeking enlarged rights of visitation. The case was referred to a master who heard testimony and filed a report setting forth his findings of fact and recommendations for disposition. Judge Leonard Jacobson entered an immediate order [1] adopting the master's recommendations, thereby increasing the amount of child support to be paid by the father from $50 to $118 each week, continuing the existing visitation schedule, and imposing additional restrictions upon the father in the following words:

ORDERED, that Ronald E. Kirchner shall be prohibited from and is hereby ordered not to have the minor child of the parties participate in any church or church-related activity while said minor child is in his care and custody during his visitation periods; and it is further

ORDERED, that if Ronald E. Kirchner violates the aforementioned prohibition regarding visitation, that all visitation shall be stopped pending further hearing by this Court. . . .

---

1. At the time the order was issued, Maryland Rule 2–541(g) permitted the entry of an immediate order in certain cases, subject to later determination by the court on any exceptions that might be filed. Since that Rule was amended effective 1 July 1991, a court may no longer enter an order based upon a master's recommendation until the court has ruled on any timely filed exceptions unless the specific requirements of Rule S74A(f)(2) regarding *pendente lite* relief are satisfied.

The father filed timely exceptions, complaining of the additional restrictions and the extent of the increase in child support. The mother filed cross-exceptions, contending the father should not continue to have visitation on Sunday, and that the father should have been required to pay the mother's attorney's fees. The exceptions were heard by Judge Dana M. Levitz, who thereafter filed an order stating the nature of the exceptions and ruling, without further discussion of the issues, as follows:

It is the Court's opinion, after reviewing the transcript of the hearing before the Master and considering the arguments of counsel, that the Master's findings are correct. Accordingly, it is the ruling of the Court that Plaintiff's and Defendant's exceptions are DENIED.

■ We shall vacate the order denying the exceptions and remand the case for further consideration because of our concern, prompted by the language of the order, that the chancellor did not apply his independent judgment to the facts properly found by the master. In *Domingues v. Johnson*, 323 Md. 486, 593 A.2d 1133 (1991), we emphasized the importance of a chancellor's decision in this type of case. We said:

The chancellor's decision in a contested custody case, frequently among the most difficult a judge is called upon to make, is of critical importance. It significantly impacts upon the lives of the parents and children involved. It is unlikely to be overturned on appeal. And, once that decision has been entered as a judgment, it will ordinarily not be modified except upon a showing of a change in circumstances justifying a change in custody to accommodate the best interest of the child.

323 Md. at 492–93, 593 A.2d 1133 (footnote and citation omitted). *See also Hadick v. Hadick*, 90 Md.App. 740, 743–745, 603 A.2d 915 (1992). In *Domingues*, we remanded the case for further consideration by the chancellor because the wording of his order suggested he had accepted the master's recommendations upon a finding that they were not

clearly erroneous, rather than exercising his independent judgment on those issues. 323 Md. at 493, 593 A.2d 1133.

The order in the case before us similarly suggests that this chancellor accepted the master's recommendations simply because the master's findings of fact were found to be correct. There is no discussion of the issues by the chancellor, and no indication that he applied his independent judgment in reaching the conclusion he did.[2]

■ We also said in *Domingues,* in commenting upon the responsibility of the chancellor when resolving challenges to a master's findings of fact, that

> [t]he chancellor must carefully consider the mother's allegations that certain findings of fact are clearly erroneous, and decide each such question. The chancellor should, in an oral or written opinion, state how he resolved those challenges. Having determined which facts are properly before him, and utilizing accepted principles of law, the chancellor must then exercise independent judgment to determine the proper result.

*Id.* at 496, 593 A.2d 1133. We now make clear that the oral or written opinion of the chancellor should address as well the issues relating to the conclusions to be drawn from the facts found. Maryland Rule 2–522(a) provides:

> In a contested court trial, the judge, before or at the time judgment is entered, shall dictate into the record or prepare and file in the action a brief statement of the reasons for the decision and the basis of determining any damages.

Rule 2–522(a) was derived from former Rule 18 b, which applied to law and equity actions and which required the trial judge in a non-jury case to "dictate to the court stenographer or reporter, or prepare and file in the action a brief statement of the grounds for its decision." A predecessor statute, Article 16, § 209 of the Maryland Code

---

**2.** The chancellor did not have the benefit of our opinion in *Domingues* when he filed his order in this case.

(1951), now repealed, required the chancellor to file an opinion whenever a final order "shall have passed upon argument, oral or in writing, on the part of any of the parties in [an equity case]." It is obvious from the history of the Rule as well as from its express wording that Rule 2–522(a) applies to a final judgment in every non-jury action, whether legal or equitable in nature.

Our predecessors noted the value to an appellate court of a trial judge's opinion in *Weaver v. King, Admr.*, 184 Md. 283, 289–90, 40 A.2d 511 (1945). More recently in *Shum v. Gaudreau*, 322 Md. 242, 245, 587 A.2d 248 (1991), we reinforced the importance and mandatory nature of a similar rule requiring judges of the circuit court to file a written opinion "stating briefly the decision made on each issue" when deciding appeals on the record from the District Court. We think it is at least as important in a case of this kind that the chancellor's opinion should reflect consideration of the relevant issues and the reasoning supporting the chancellor's independent decisions on those issues, and we observe that Rule 2–522(a) requires no less.

For the guidance of the chancellor upon remand, and because we have had the benefit of full briefing and argument upon the sensitive issues involved in connection with the father's visitation rights, we offer certain comments on those issues.

When Bridgette was born in September of 1981, the father was a Catholic and the mother a Lutheran. According to the mother, the parties orally agreed at that time to raise the child in the Catholic faith, and the child was baptized in that faith. When the child became old enough to attend church, the mother took her to Lutheran services. The father converted to the Methodist religion after the parties were divorced. Religion did not become a problem between the parties until 1989, when the father again changed churches, this time to a fundamentalist Baptist church.

According to the mother, the child began to display signs of anxiety in late 1989. She said the child suffered anxiety attacks and had trouble sleeping just prior to scheduled visitations and would come home from visitations crying. The mother attributed these problems to the child's participation in certain activities of the father's church, and to conflicts arising from the ardor with which the father pursued newly-found fundamentalist beliefs in his conversations and dealings with the child. The mother discussed her concerns with the father and asked him not to take the child to the Baptist church. The father refused this request. The problems continued into the spring of 1990, when the mother discussed her concerns with the child's pediatrician and the child's teacher and, after again being rejected by the father, sought the services of Dr. Ulko Ulger, a psychiatrist with a sub-specialty in child and adolescent psychiatry.

The child was seen by Dr. Ulger in May and has been followed in counseling sessions by Ms. Patricia Schwarcz, a licensed certified social worker under Dr. Ulger's supervision. In July, the mother filed the petition at issue.

The master heard two days of testimony, and concluded that the issue of modification of visitation "is based in part on the decision of the father to involve the minor child in his religious practices." The master concluded that

by compelling the minor child to participate in his religious practices the father is harming the child and that such harm is, in fact, detrimental to her well-being—and that it is not in the best interest of the child to participate in the father's religious practices.

The master then recommended the limitations and prohibitions that were incorporated into the order.

The father contends the evidence was insufficient to support the findings or the recommendations of the master. He argues that the restrictions imposed upon him violate the establishment and free exercise of religion clauses of the First Amendment to the United States Constitution, as well as the 36th Article of the Declaration of Rights of

Maryland. Moreover, he says, the restrictions are unnecessarily broad.

As various courts have pointed out, "intervention in matters of religion is a perilous adventure upon which the judiciary should be loath to embark." *Wojnarowicz v. Wojnarowicz*, 48 N.J.Super. 349, 137 A.2d 618, 621 (1958); *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133, 1135 (1971); *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1, 7 (1990) (Shanahan, J. dissenting). And, as the Supreme Court of North Dakota noted, "[f]ew areas of dispute in child custody and visitation cases are more fraught with difficulty than those involving differences in the religious beliefs of the divorced parents." *Hanson v. Hanson*, 404 N.W.2d 460, 463 (N.D.1987).

When the welfare of a child is threatened, however, the task of intervention cannot be avoided, and under some circumstances actions based upon the sincerely held religious beliefs of one parent or both parents must give way to the safety and welfare of the child. *See, e.g., Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (child labor laws prohibiting children from selling materials on streets may be applied to prohibit child of Jehovah's Witness faith from selling religious magazines); *Craig v. State*, 220 Md. 590, 599–602, 155 A.2d 684 (1959) (parents must provide necessary medical care to child notwithstanding sincerely held religious views to the contrary). In *Levitsky v. Levitsky*, 231 Md. 388, 190 A.2d 621 (1963), our predecessors approved an order granting standing permission to physicians to administer transfusions of blood or plasma when medically required to the child of a custodial parent who objected to transfusions on religious grounds. The Court explained:

> Where ... there is a serious danger to the life or health of a child as a result of the religious views of a parent, the rule seems to be recognized in other jurisdictions which have considered the question that this may bar

custody by the parent holding such views, or may call for protection against such views by an appropriate order. *Id.* at 398, 190 A.2d 621.

When the life or physical safety of a child is threatened, the delicate accommodation between religious freedoms and an exercise of state authority is necessarily made. As the threat to the child diminishes, the balancing of interests becomes more difficult. Accordingly, courts that have considered custody or visitation disputes involving the religious practices of the parents have generally required a clear showing that a parent's religious practices have been or are likely to be harmful to the child before allowing judicial interference with those religious practices. *In re Marriage of Murga,* 103 Cal.App.3d 498, 163 Cal.Rptr. 79, 82 (1980); *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861, 863 (1977); *Osier v. Osier,* 410 A.2d 1027, 1030 (Me.1980); *Felton v. Felton,* 383 Mass. 232, 418 N.E.2d 606, 607–08 (1981); *Pope v. Pope,* 267 S.W.2d 340, 343 (Mo.App.1954); *LeDoux v. LeDoux, supra,* 452 N.W.2d at 5; *Khalsa v. Khalsa,* 107 N.M. 31, 751 P.2d 715, 719–21 (Ct.App.1988); *Hanson v. Hanson, supra,* 404 N.W.2d at 463–64; *Zummo v. Zummo,* 394 Pa,Super. 30, 574 A.2d 1130, 1140–41 (1990); *Robertson v. Robertson,* 19 Wash.App. 425, 575 P.2d 1092, 1093 (1978); *Munoz v. Munoz, supra,* 489 P.2d at 1135–36. *See also Developments in the Law: The Constitution and the Family,* 93 Harv.L.Rev. 1156, 1338–40 (1980); Anno., *Religion As Factor In Child Custody And Visitation Cases,* 22 A.L.R.4th 971, 1020–28 (1983).

■ In *Munoz, supra,* the Supreme Court of Washington summarized the general rule in the following language:

The courts are reluctant ... to interfere with the religious faith and training of children where the conflicting religious preferences of the parents are in no way detrimental to the welfare of the child. The obvious reason for such a policy of impartiality regarding religious beliefs is that, constitutionally, American courts are

forbidden from interfering with religious freedoms or to take steps preferring one religion over another....

\* \* \* \* \* \*

[T]he rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.

489 P.2d at 1135.

The "clear and affirmative showing" of which the *Munoz* Court spoke means something more than general testimony of a parent that the child is "confused" or "upset" by conflicting religious practices. *Khalsa v. Khalsa, supra,* 751 P.2d at 720; *Felton v. Felton, supra,* 418 N.E.2d at 610; *Hanson v. Hanson, supra,* 404 N.W.2d at 464; *Robertson v. Robertson, supra,* 575 P.2d at 1093. A factual finding of a causal relationship between the religious practices and the actual or probable harm to a child is required—mere conclusions and speculations will not suffice. *Khalsa,* 751 P.2d at 720; *Robertson,* 575 P.2d at 1093. When the evidence is sufficient to demonstrate the need for intervention, the remedy should be that "which intrudes least on the religious inclinations of either parent and is yet compatible with the health of the child," *Felton,* 418 N.E.2d at 608, and should be "narrowly tailor[ed] ... so as to result in the least possible intrusion upon the constitutionally protected interests of the parent," *LeDoux,* 452 N.W.2d at 5.

In the case before us, the restrictions recommended by the master, and now incorporated in the court order, appear to be at once too broad and too narrow—overly broad in the sense that activities are prohibited which are not shown by the record to be harmful, and yet not sufficiently limiting in areas of demonstrated harmful conflict. The order prohib-

**578**

its the father from having the child "participate in any church or church-related activity" while in his custody. Quite apart from the problems of interpretation and enforcement that an order of this breadth will necessarily entail, the order clearly reaches activities such as church picnics, bicycle rodeos, and the like that this record does not show would be harmful to the child.

Dr. Ulger's principal recommendation for a change in visitation was that some other day be substituted for Sunday. This, he thought, would go a long way toward diminishing religious conflicts in the child's mind and between the parents, and would permit the father to have more "quality time" with his daughter when he was not so preoccupied with church matters. Dr. Ulger testified he saw no harm in the child attending bicycle events put on by the church or church suppers. The mother, on the other hand, asked for veto power over every activity that in any way involved the Baptist church because there might be "a religious ceremony" involved, which would expose the child to dogma the mother believed contributed to the conflict in the child's mind.

Whether the father should be prohibited from taking the child to church services or church Sunday school is a different matter, deserving careful consideration by the chancellor. It seems clear that the father's conversion to the Baptist faith has rather dramatically altered his lifestyle. His commitment to his new faith apparently includes a need to proselytize, and he has included his daughter in those efforts. Not only has the father involved his daughter with his door-to-door distribution of religious tracts, he has actively sought to convert her, and perhaps her mother, and to have the child baptized in the Baptist church.

It was the proselytizing by the father and the direct involvement by the child in his efforts to convert others that Dr. Ulger found particularly harmful to the child, and thus the record would support a prohibition of activities of this type in the future. The mother has at all times had legal

custody of this child, and as we said in *Taylor v. Taylor*, 306 Md. 290, 296, 508 A.2d 964 (1986):

> Embraced within the meaning of 'custody' are the concepts of 'legal' and 'physical' custody. Legal custody carries with it the right and obligation to make long range decisions involving education, *religious training*, discipline, medical care, and other matters of major significance concerning the child's life and welfare. (Emphasis added; footnote and citations omitted.)

*See also In re Marriage of Murga, supra*, 163 Cal.Rptr. at 82, holding that ordinarily the parent having legal custody has the authority to decide what religious training the child shall receive.

We also pointed out in *Taylor* that the parent not having legal custody was necessarily obliged to exercise authority over the child during periods of visitation, but that "[t]his residuum should be exercised so as not to conflict with the long range decisions and policies made by the parent having legal custody." *Id.* [306 Md.] at 296 n. 4, 508 A.2d 964. We do not suggest that under ordinary circumstances attendance at a noncustodial parent's church, although of a different faith from that selected by the custodial parent, is improper. Indeed, as the Supreme Judicial Court of Massachusetts pointed out in *Felton v. Felton, supra*, 418 N.E.2d at 607–08:

> There may also be a value in letting the child see, even at an early age, the religious models between which it is likely to be led to choose in later life. And it is suggested, sometimes, that a diversity of religious experience is itself a sound stimulant for a child.

In this case, however, the father has been zealous in his exposure of the child to his religious faith, and the child is currently suffering harm from conflicts between the parents, including conflicts growing out of religious differences, so that careful attention is needed to resolve the delicate question of what is in the best interest of this child with respect to attendance at the father's church.

In this regard, there are questions presented by this record that may, in the discretion of the chancellor, justify the receipt of additional evidence. Dr. Ulger expressed a qualified concern about the child attending church services with the father. Yet, it appears from our review of the record that the child has not attended church services but has attended Sunday school class while the father has attended church services. The only evidence of record concerning the content of the Sunday school curriculum came from the pastor of the Baptist church, who described it as non-denominational. Assuming the chancellor should decide that attendance at Baptist church services, under the particular circumstances of this case, would be inimical to the best interest of the child, he should carefully consider whether attendance at Baptist Sunday school should also be prohibited. In doing so, he should keep in mind that the current visitation schedule results in the child being with the father on a majority of Sundays during the year, and the effect of the current order would be to deprive the child of a significant opportunity for religious experience on her sabbath. Obviously, the chancellor may also consider a change in days of visitation, as recommended by Dr. Ulger, although the master apparently felt that the work schedules of the parents made this an unlikely solution.

It is true that the child told the master she did not much like participating in the activities of her father's church and that she found her mother's church "more fun," but she also testified that she had "a lot of friends at her father's church." Although the views of a 10–year–old child on whether she would like to attend Sunday school should be given some consideration, those views will not be dispositive. We are not certain how many children of that age would opt for church or Sunday school in the absence of parental direction.

The record in this case strongly suggests that the root of the child's current problem is conflict between her parents—conflict that has apparently been present since their separation, but which has become more pronounced and has

had a greater impact upon the child since the father adopted fundamentalist views which at times he has imposed upon the child and which are not consistent with the views of the mother.

These views include his fundamental belief about salvation, which is contrary to that of the mother, and which has caused the child obvious concern because of the father's insistence that the mother has not been "saved" and is therefore destined for eternal damnation. They include his beliefs on "rock and roll" music which led him to break a number of phonograph records in his daughter's presence to impress her with the fact that they were "bad," and which led to feelings of guilt and conflict when the child listened to similar music permitted by her mother. The record would also support findings that the father has created conflict within the child's mind and caused anxiety by imparting his views on modesty to the child through the criticism of a bathing suit furnished by the mother, and by reason of his dedication to proselytizing which caused him to attempt to convert and baptize his daughter when he should have appreciated the mother's dominant role in establishing religious education. Moreover, the record supports the finding that the use of his daughter in his door-to-door distribution of religious tracts contributed to her distress.

Yet, Dr. Ulger opined that "I don't really feel that religion is a primary issue. I think religion is the secondary issue. I think it's an important element in contributing to the parent conflict." Some of these conflicts, having to do with what is "right" or "wrong," although perhaps inspired by religious dogma are not necessarily dispositive of the question of whether the child should be permitted to attend church-related activities when she is with her father. If the activities do not involve proselytizing or inculcation of dogma inconsistent with the religious training she receives at the direction of her mother, and do not otherwise produce additional unwarranted conflict in this child's mind, they should not be prohibited.

This record reflects that the child is suffering from the effects of parental conflicts. Judicial intervention of some kind is indicated, and we remand the matter for the thoughtful consideration of the chancellor in the light of the general principles we have discussed.

ORDER OF THE CIRCUIT COURT FOR BALTIMORE COUNTY OVERRULING EXCEPTIONS TO THE REPORT AND RECOMMENDATIONS OF THE DOMESTIC RELATIONS MASTER VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THE VIEWS EXPRESSED HEREIN; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.