### Barbara Zeitler Kendall *vs.* Jeffrey P. Kendall.

Norfolk. October 7, 1997. - December 9, 1997.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Marshall, & Ireland, JJ.

*Religion. Constitutional Law,* Freedom of religion, Establishment of religion. *Divorce and Separation,* Child custody, Division of property, Attorney's fees.

In a divorce action, the judge's findings, based on a report of a guardian ad litem, that there was demonstrable evidence of substantial harm to the children ages three, five and seven, supported her order restricting the father's freedom to educate the children in the tenets of his religion. [243-249]

In a divorce proceeding, the judge's order, based on a finding of demonstrable evidence of substantial harm, requiring the father to limit his sharing certain aspects of his religious beliefs with the three children of the marriage, was not, in the circumstances, an unconstitutional burden on the father's right to practice religion [249-250], nor did the order violate art. 1 of the Amendments to the Massachusetts Constitution or the establishment clause of the First Amendment to the United States Constitution, where the intent of the order — to limit harm to the children — was wholly secular and where it did not foster excessive government entanglement with religion [250-251].

A Probate Court judge did not abuse her discretion in awarding to the parties in a divorce joint legal custody of their children [251], nor did she abuse her discretion in the division of the marital assets [251] or in declining to award attorney's fees to the wife [251-252].

Complaint for divorce filed in the Norfolk Division of the Probate and Family Court Department on November 25, 1994.

The case was heard by *Christina L. Harms,* J., and posttrial motions were heard by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael S. Greco (Robert A. Bertsche & Melissa J. Solomon* with him) for Jeffrey P. Kendall.

*David E. Cherny (Jacob M. Atwood* with him) for Barbara Zeitler Kendall.

Lynch, J. This appeal arises out of a judgment of divorce nisi

issued on August 20, 1996.[1] Jeffrey P. Kendall, the defendant, appeals from provisions of the divorce judgment and a temporary order issued after Barbara Zeitler Kendall, the plaintiff, filed a complaint against him in the Probate Court for contempt of the divorce judgment.[2] The plaintiff also filed a cross appeal, requesting an award of attorney's fees and reversal of the joint custody order and disposition of the marital home. We granted the defendant's application for direct appellate review.

1. *Factual background.* We summarize the facts found by the judge. The parties professed to hold different religious beliefs when they were married in 1988, the plaintiff being Jewish, and the defendant, Catholic.[3] The parties' fundamental religious differences would be unremarkable but for their controversial effect on their three minor children[4] caught in the crossfire generated by their parents. Before the parties were married, they

---

[1]On September 26, 1996, the Probate and Family Court judge issued a clarified judgment of divorce nisi, nunc pro tunc, to August 20, 1996. The clarified judgment effectuated minor changes to provisions of the initial judgment. These changes are unrelated to the issues raised in this appeal. Except for the minor revisions, the initial judgment and the clarified judgment are essentially the same.

[2]The judge issued the challenged temporary order on October 22, 1996 *"[i]n the interim"* and *"until the matter could be heard at trial"* (emphasis added). We reject the defendant's argument that the order is reviewable by this court. Despite the defendant's present position, he treated these orders as temporary when he appealed on November 27, 1996, pursuant to G. L. c. 231, § 118, first par. We note that, were we to conclude that the temporary orders were properly before us, we would scrutinize very carefully any order requiring an individual to audiotape religious services unless there was general acquiescence to the order's mandates. We would look more favorably on an order defining neutral solutions so as to minimize the court's involvement in sectarian issues. For instance, requiring a neutral observer to determine whether the content of religious services was violative of the court's judgment and to report any detrimental effect on the children would allow the court to maintain its focus on the legal issues rather than engage in an interpretation of the intricacies of the parties' respective beliefs.

[3]We note the judge's determination that "[b]oth parents share this view: that Jews do not believe that Jesus [Christ] was the son of God, while Christians do believe that Jesus was the son of God." While noting the divergent beliefs, we do not imply that this seeming "[i]rreconcilability" inevitably signifies conflict and hostility. See *Zummo* v. *Zummo*, 394 Pa. Super. 30, 76 (1990) (refusing to weigh reconcilability of Christianity and Judaism).

[4]The children are Ariel (born October 10, 1988), Moriah (born May 19, 1991), and Rebekah (born April 21, 1993).

discussed the religious upbringing of any children, and agreed that children would be raised in the Jewish faith.[5]

In 1991, the defendant became a member of the Boston Church of Christ, a fundamentalist Christian faith. The defendant believes in Jesus Christ and that those who do not accept the Boston Church of Christ faith are "damned to go to hell" where there will be "weeping and gnashing of teeth." The defendant testified that he would like his children to accept Jesus Christ and that he "will never stop trying to save his children."

The parties' divergent views polarized in 1994 when the plaintiff adopted Orthodox Judaism.[6] Ariel also began studying and adhering to principles of Orthodox Judaism. Soon after the parties' beliefs drifted to opposite doctrinal extremes, the plaintiff filed for divorce in November, 1994, based on an irretrievable breakdown of the marriage, pursuant to G. L. c. 208, § 1B.

2. *The court proceedings.* At the outset the plaintiff sought to limit the children's exposure to the defendant's religion, and the defendant objected to any limitation on his ability to share his religious beliefs with the children.[7] On October 18, 1995, the judge granted the plaintiff's request for the appointment of a

---

[5]The majority of courts adhere to the view that predivorce agreements are constitutionally unenforceable. See C.P. Kindregan & M.L. Inker, Family Law and Practice § 20.5, at 647 (2d ed. 1996) ("unimaginable that a court would specifically enforce a contract governing . . . the religious education of any children born of the marriage"); *Zummo* v. *Zummo, supra* at 58-67 (collecting cases). We note, however, that the judge found the children had primary familiarity with the Jewish faith. The judge concluded the children had a "Jewish identity" based on evidence that: the parties were married in a traditional Jewish wedding ceremony; Ariel was circumcised in accordance with Jewish tradition; both Moriah and Rebekah had traditional Jewish naming ceremonies; the parties agreed the children would attend a Jewish school; and all three children are so enrolled.

[6]Orthodox Judaism is considered the most strictly doctrinal of the three Jewish movements (Reform, Conservative, and Orthodox).

[7]After the plaintiff filed her complaint for divorce, a probate judge entered a temporary order according to a stipulation of the parties dated December 9, 1994. That "agreement" demonstrated that the parties considered their divergent religious views an issue throughout the divorce. The stipulation contained a provision stating, "Neither party shall make negative or derogatory comments to the children about the other parent or his/her religion." As soon as the order issued, both parties challenged the order's visitation schedule as interfering with planned weekend religious events with the children.

guardian ad litem (GAL) to "address the inter-religious conflict between the parties in particular."[8]

In *Felton* v. *Felton*, 383 Mass. 232, 233 (1981), this court addressed the question of accommodating diverse religious practices of parents, living apart, in the upbringing of minor children. The court held that the overriding goal in any such inquiry is to serve the best interests of the children even where "the attainment of that purpose . . . involve[s] some limitation of the liberties of one or other of the parents." *Id.* at 233.

The judge found it substantially damaging to the children to leave each parent free to expose the children, as he or she wishes, to his or her religion. The resulting judgment of divorce contained the following paragraphs:[9]

> "5. *RESTRICTIONS UPON RELIGIOUS EXPOSURE*: Each parent shall be entitled to share his/her religious beliefs with the children with restrictions as follows: neither may indoctrinate the children in a manner which substantially promotes their . . . alienation from either parent or their rejection of either parent. The [defendant] shall not take the children to his church (whether to church services or Sunday School or church educational programs); nor engage them in prayer or bible study if it promotes rejection rather than acceptance, of their mother or their own Jewish self-identity. The [defendant] shall not share his religious beliefs with the children if those beliefs cause the children significant emotional distress or worry about their mother or about themselves. Thus, for example, [the defendant] may have pictures of Jesus Christ hanging on the walls of his residence, and that will not serve as any basis for restricting his visitation with his children. But, [the defendant] may not take the children to religious services where they receive the message that adults or children who do not accept Jesus Christ as their lord and

---

[8]The judge appointed Dr. Michael A. Goldberg as the guardian ad litem (GAL). The defendant initially expressed concern that the GAL would be biased because he perceived him as being Jewish. However, when the GAL indicated his willingness to withdraw, the defendant told him he wished to proceed and stated he was comfortable with his ability to conduct the investigation without bias.

[9]The judgment also ordered that the plaintiff retain sole physical custody of the children, and awarded the parties joint legal custody. The plaintiff's challenge to the award of joint custody is discussed in a subsequent section.

savior are destined to burn in hell. By way of further example, [the defendant] may not shave off [Ariel's] payes. This provision shall not be construed so as to prevent [the defendant] from having the children with him at events involving family traditions at Christmas and Easter.

"In the event that there is a disagreement between the parents as to whether one or more of the children could be exposed to the religious belief(s) of [the defendant] with*out* substantial negative impact upon their emotional health, the parents shall engage the services of Michael Goldberg, Ph.D., to act as G.A.L./investigator/evaluator on such issues and disputes. The fee of Dr. Goldberg shall be shared equally by the parties. In the event that Dr. Goldberg is unable to serve in this capacity, then the parties shall agree upon an alternate child psychologist, or an alternate shall be selected by the Court. . . .

"6. *EXPLANATION TO CHILDREN*. Neither party shall initially discuss with the children the terms and conditions of this Judgment. Within two (2) days of the date of receipt of this Judgment, the Plaintiff shall contact the Court-appointed Guardian Ad Litem, Dr. Michael Goldberg, to arrange for a meeting with the children. Dr. Goldberg shall explain to the children, in a developmentally appropriate manner, the Court's decision, with the goal being to help the children understand that they are being raised in the way they are because the Court believes that it is in their best interest. It is intended by the Court that this intervention may help the children avoid blaming themselves."

The defendant argues in this appeal that the judge's findings did not demonstrate "substantial harm" to the children so as to warrant the limitations imposed on his liberty interest in educating his children in the tenets of his religion. He challenges both the judge's factual findings of harm and the legal conclusions based on that evidence.[10]

3. *Standard of review.* We scrutinize without deference the legal standard which the judge applied to the facts to ensure the ultimate findings and conclusions are consistent with the law. *Williams* v. *Resolution GGF Oy*, 417 Mass. 377, 382 (1994),

---

[10]As in *Felton* v. *Felton*, 383 Mass. 232, 239 (1981), this appeal brings questions of law, fact, and discretion.

citing *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976). The plaintiff was required to demonstrate "in detail" that exposure to the defendant's religion caused the children "substantial injury, physical or emotional, and [would] have a like harmful tendency for the future." *Felton* v. *Felton, supra* at 234, 235. We uphold the judge's factual findings unless they are clearly erroneous[11]; we review her legal conclusions to ensure they are based on correct legal standards. *Williams* v. *Resolution GGF Oy, supra* at 382 n.6.

4. *Analysis.* "[P]arents together have freedom of religious expression and practice which enters into their liberty to manage the familial relationships." *Felton* v. *Felton, supra* at 233, citing *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972). Those individual liberties may be restricted where there is a compelling interest. *Felton* v. *Felton, supra.* A parent's right to practice religion may be restricted only where limited exposure to that parent's beliefs is necessary to further a child's best interests. *Felton* v. *Felton, supra.* To do so, there must be an affirmative showing of harm caused by exposure to the conflicting religious teachings. *Id.* at 233-234.

The determinative issue is whether the harm found to exist in this case is demonstrated to be so substantial so as to warrant a limitation on the defendant's religious freedom. In *Felton* v. *Felton*, this court suggested that a "likely source[]" of proof of substantial harm "by implication" could be derived from testimony as to the child's general demeanor, attitude, school work, appetite, health or outlook. *Id.* at 242, citing *Pope* v. *Pope*, 267 S.W.2d 340, 343 (Mo. Ct. App. 1954). The court also opined that the "wholly uncorroborated testimony" of a parent was insufficient to demonstrate harm. *Felton* v. *Felton, supra.* By implication, the court suggested that a plaintiff should consult "church, school, medical or psychiatric authorities" to support a charge that a child has been harmed by exposure to the parent's religious beliefs. *Id.* Moreover, the court specifically recommended the appointment of "a qualified investigator

---

[11]We reject the defendant's argument that the judge improperly relied on Dr. Steven Hassan's testimony regarding cults, mind control, and the Boston Church of Christ. The defendant contends Dr. Hassan was not a qualified expert and his testimony was highly prejudicial. Even assuming the testimony was inadmissible, the judge specifically stated that she did not rely on Dr. Hassan's testimony in making her ruling; therefore, there can be no prejudicial effect. See *Berlandi* v. *Commonwealth*, 314 Mass. 424, 452 (1943); *Commonwealth* v. *Darby*, 37 Mass. App. Ct. 650, 655 (1994).

(whether called a guardian or some other title) who would look into the facts, render a report, and be subject to examination by the parties." *Id.*

Other States have struggled to define what constitutes substantial harm.[12] Very few have actually ruled that substantial harm had been demonstrated.[13] [14]

We adhere to the line of cases requiring clear evidence of substantial harm.[15] See note 12, *supra.* Application of the strict

[12]See *Khalsa* v. *Khalsa*, 107 N.M. 31, 36 (Ct. App. 1988) (general testimony regarding parents' divergent religious beliefs causing child to be upset or confused insufficient to justify restriction of exposure to noncustodial parent's religion); *Munoz* v. *Munoz*, 79 Wash. 2d 810, 815 (1971) (duality of religious beliefs does not per se create conflict in child's mind); *Robertson* v. *Robertson*, 19 Wash. App. 425, 427 (1978) (child's alarm at religious beliefs insufficient); *Zummo* v. *Zummo*, 394 Pa. Super. 30, 74-76 & n.39 (1990) (rejecting speculation by parents and experts as to potential future emotional harm to child based on assumption that exposure is generally harmful); *In re Marriage of Weiss*, 42 Cal. App. 4th 106, 116-117, cert. denied sub nom. *Weiss* v. *Weiss*, 519 U.S. 1007 (1996) (rejected notion that contradictory messages caused harm, no evidence child had disciplinary problems, nor bruises); *In re Marriage of Mentry*, 142 Cal. App. 3d 260, 266 (1983) (held that evidence of child's social adjustment problems in school and periodic stomach aches were not attributable to conflict over religion); *Kirchner* v. *Caughey*, 326 Md. 567, 577, 579 (1992) (child psychiatrist determined that child suffered from anxiety was not conclusive where problems could just as easily have been attributed to parental conflicts); *Levitsky* v. *Levitsky*, 231 Md. 388, 398 (1963) (requiring serious danger to life or health of child before determining protection necessary from exposure to parent's religious beliefs).

[13]In *Morris* v. *Morris*, 271 Pa. Super. 19, 35 (1979), the court prohibited the child's father, a Jehovah's Witness, from bringing the child, a baptized Catholic, with him on door-to-door proselytetic endeavors. *Kirchner* v. *Caughey*, *supra* at 581, similarly cautioned against prohibiting parents' ability to share their religious beliefs with their children unless the beliefs involved proselytizing. See *Prince* v. *Massachusetts*, 321 U.S. 158 (1944) (limiting guardian's ability to expose minor child to religious proselytizing). In *Ledoux* v. *Ledoux*, 234 Neb. 479, 486 (1990), the court upheld a prohibition of a child's exposure to the noncustodial parent's religion where a child psychologist found the child suffered from "serious" stress evidenced by bed wetting. In *Ledoux*, however, the Nebraska court followed its precedent that the custodial parent usually determines the child's religious upbringing. *Id.*

[14]One State court seemed to recognize the broad range of available case law, stating, "As the threat to the child diminishes, the balancing of interests becomes more difficult." *Kirchner* v. *Caughey*, *supra* at 576.

[15]The case of *Morris* v. *Morris*, *supra*, cautioned against an *overly* strict requirement of substantial harm. In *Morris*, *supra* at 34, the court noted that, in a given case, the court should not have to wait until a showing of present psychological harm "progress[es] to a mentally crippling point before action could be taken."

requirements in those cases comports with the protections of religious freedoms historically preserved under the Massachusetts Constitution. See *Society of Jesus of New England* v. *Boston Landmarks Comm'n*, 409 Mass. 38 (1990), *S.C.*, 411 Mass. 754 (1992) (citing authorities documenting historical protection of religious freedoms).

The harm found to exist in this case presents more than the generalized fears criticized in *Felton* v. *Felton, supra.* The judge afforded substantial weight to the GAL's report.[16] The judge considered the report so "comprehensive" that it should be considered in its entirety on any appellate review.[17] Among the factors the judge cited to support her conclusion that substantial harm to the children had been demonstrated are the following findings:

"20. I find that, in early 1995, the [defendant] threatened to cut the fringe off Ariel's tzitzitz if he did not tuck it inside his pants. This greatly upset Ariel and the [plaintiff], and the [defendant] later apologized.

"21. I also find that, in the summer of 1995, the [defendant] cut off Ariel's payes. I do not find credible the [defendant's] explanation that he did so at Ariel's request.

" . . .

"24. I find that the Boston Church of Christ services to which [the defendant] has taken his children have included teachings that those who do not accept the Boston Church of Christ faith are damned to go to hell where there will be 'weeping and gnashing of teeth.'

"25. I find that the oldest child, Ari, has drawn from

---

[16] The GAL's report was based on interviews with the parents, the children, and the children's teachers, psychological tests, and observations of the children interacting with both parents.

[17] We reject the defendant's argument that the judge erred in refusing to allow him to review the GAL's file notes. The defendant was not denied an opportunity to rebut the GAL's report or cross-examine the GAL. See *Gilmore* v. *Gilmore*, 369 Mass. 598, 605 (1976) (finding error where judge refused to allow GAL to testify at trial). The defendant had a copy of the GAL's report and took advantage of his opportunity to cross-examine the GAL at trial. There was no error.

the above teaching the conclusion that [the plaintiff] may go to hell, and that this causes him substantial worry and upset.

". . .

"56. [The defendant's] behavior toward his children fosters negative and distorted images of the Jewish culture. [The defendant] insists that all individuals who do not accept his beliefs about life and existence are sinners who are destined to torturous punishment. [The defendant] opposes his children being taught the history of the Holocaust. Further, [the defendant's] cutting off of Ari's religiously meaningful side burns (payes), and his threats to cut off his clothing fringes (tzitzitz) show that he does not refrain from inducing guilt in the child for having the beliefs that he does.

"57. I find that Ari has a strong Jewish self-identity. I am persuaded by the report of the G.A.L. that Ari 'clearly identified himself and his siblings as being Jewish and provided a rationale based on Jewish law for his belief that he is Jewish,' and that the child's 'behavior in which he ascribes his Jewish identity to Jewish law and theology is indicative of his attainment of a formal self-identification of himself as a Jew.' Indeed, [the defendant] himself reluctantly concedes that if asked, Ari would unquestionably say he is Jewish.

"58. [The defendant] understands that Ari perceives himself as Jewish, and that having a Jewish identity is akin to having an ethnic identity. But the matter goes further. Ari perceives his Jewishness as being part of his 'soul.' For Ari, efforts to convince him that his religion is wrong are logically equated with convincing him that his 'soul' is damaged or inadequate. . . .

"59. I credit the G.A.L.'s report and testimony that Ari 'may experience choosing a religion as choosing between his parents, a task that is likely to cause him significant emotional distress.' In fact, the G.A.L. specifically concludes, and I credit his conclusion, that the children are

now in a position where they are perilously close to being forced to choose between their parents, and to reject one.

"60. I find, based upon the G.A.L.'s report as well as his testimony, that the oldest child Ari '. . . is emotionally distressed by the conflict between his strong desire for affection and approval from [the defendant] and his desire to maintain his Jewish religious practice,' and that as a direct result '. . . there has been a decline in his motivation and academic performance.'

"   . . .

"62. I find that Ari is understandably uncomfortable and unhappy when he 'has to do the stuff [he's] not supposed to do on Shabbas', and that precisely as the G.A.L. indicates, Ari then has the no-win dilemma of pleasing and obeying [the defendant] (while displeasing and disobeying [the plaintiff] and his own internalized beliefs about how the world is 'supposed' to function on the Sabbath) or the reverse. Poor Ari: he told [the defendant] that he 'wants to celebrate the Sabbath and not do stuff that I'm not supposed to do', and [the defendant's] response was 'we'll discuss that with the lawyers.'

"   . . .

"64. I credit the G.A.L.'s report that 'Moriah is experiencing emotional distress related to the parental conflict . . .' I find that Moriah has a very solid understanding of who she is and who her family is: 'I'm not Christian. I'm Jewish. Mom is Jewish. My dad is Christian. My brother is Jewish and my sister is Jewish.' Moriah's straightforward description is comfortable and age-appropriate. More importantly, it is accurate. And most important of all, it shows that she can tolerate the knowledge of her parents' religious differences.

"   . . .

"66. I find, based upon the G.A.L.'s report that Rebekah is likely to experience '. . . a sense of not belonging

in her own home' by '. . . anything that serves to promote her identity as fundamentally different from that of her mother and siblings.' I find this would be substantially to her detriment.

"67. I credit the report of the G.A.L. that 'should the children come to accept the religious beliefs that [the defendant] reports he wants them to accept, they are likely to come to view their mother negatively and as a person who will be punished for her sins . . .' resulting in a '. . . negative impact on their relationship with their mother . . . and difficulty accepting guidance and nurturance from her.' I find this would be to the children's substantial detriment.

"68. For children of tender years (and it seems to me that this likely means at least up to age 12), I find directly contradictory messages from trusted adults to be solidly contrary to their best interests."

Whether the harm found to exist amounts to the "substantial harm" required to justify interference with the defendant's liberty interest is a close question, especially because there is considerable value in "frequent and continuing contact" between the child and both parents, and "contact with the parents' separate religious preferences." *Felton* v. *Felton, supra* at 234. In this regard the judge ruled:

"There is surface appeal to the [defendant's] argument that the [plaintiff] has not met her burden of establishing substantial present harm to the children from exposure to [the defendant's] religious beliefs and practices, for the G.A.L. found only a few instances of concrete present harm to the children. I am mindful that the G.A.L. has not found current damage to the children so severe that it has caused them to suffer a psychotic break, or to have a 'formal psychiatric diagnosis'. . . . The case law does not require the court to wait for formal psychiatric breakdown and the evidence paints a strong picture of the reasonably projected course if the children continue to be caught in the cross-fire of their parents' religious difference: [the defendant's] religion may alienate the children from their custodial parent (she is bad, she will burn in hell), and

may diminish their own sense of self-worth and self-identity (Jews are bad, Jews will burn in hell). At minimum they will be called upon to 'choose' between their parents, in itself a detrimental result. The G.A.L. predicts damaging consequences of the children's exposure to two vastly different, and on some points directly contradictory religious views. 'Sometimes . . . a diversity of religious experience is itself a sound stimulant for a child . . . the question that comes to the courts is whether, in particular circumstances, such exposures are disturbing a child to its substantial injury, physical or emotional, and will have a like harmful tendency for the future.' (*Felton*, [*supra*] at 234-235). Applying that standard to the facts of this particular case, I see substantial evidence of current and imminent harm, to these 7, 5, and 3-year-old children."

In balancing these conflicting interests, fully aware of the complexities and nuances involved, we conclude that the judge's findings support her order in paragraph 5 of the judgment.

Where, as here, the judge has found demonstrable evidence of substantial harm to the children, we reject the defendant's arguments that the divorce judgment burdens his right to practice religion under the free exercise clauses of the Massachusetts and United States Constitution.[18] Both the Massachusetts and the United States Constitutions permit limitations on individual liberties where there exists a compelling interest. See *Wisconsin* v. *Yoder*, 406 U.S. 205, 230 (1972) (deferring to parental rights with respect to religious upbringing of children absent harm to their physical or mental health); *Prince* v. *Massachusetts*, 321 U.S. 158, 166-167 (1944) (recognizing parents' rights to practice religion and rights to family decision-making are not beyond limitation); *Felton* v. *Felton, supra*, at 233 (stating limitations on individual liberties permissible where best interests of child must be promoted); *Custody of a Minor*, 375 Mass. 733, 748 (1978) (emphasizing that parental rights "do not clothe parents with life and death authority over their children"). Promoting the best interests of the children is an interest sufficiently compelling to impose a burden on the

[18]We note that the defendant has raised a constitutional claim under the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb-1 et seq. (1994). Even if properly raised, this claim cannot succeed where the Supreme Court declared the Religious Freedom Restoration Act unconstitutional in *Boerne* v. *Flores*, 117 S. Ct. 2157 (1997).

defendant's right to practice religion and his parental right to determine the religious upbringing of his children. *Felton, supra* at 233. Paragraph 5 of the divorce judgment is limited in scope and imposes a minimal burden on the defendant's right to practice religion by requiring only that he limit sharing certain aspects of his beliefs with his children. The divorce judgment imposes no additional limitations on the defendant's individual ability to practice his religion. Thus, we believe paragraph 5 of the divorce judgment is a constitutional limitation on the defendant's individual liberties as it is necessary to ensure the best interests of the children.

. The defendant's claim that the divorce judgment violates art. 11 of the Amendments to the Massachusetts Constitution and the establishment clause of the First Amendment to the United States Constitution must also be rejected. In making establishment clause assessments in the past we have applied the test set out by the United States Supreme Court in *Lemon* v. *Kurtzman*, 403 U.S. 602, 612 (1971). *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 378, cert. denied sub nom. *Bailey* v. *Bellotti*, 459 U.S. 970 (1982). In so doing we determine whether the divorce judgment has a secular purpose, that neither advances nor inhibits religion, and does not "foster 'an excessive government entanglement with religion.' " *Attorney Gen.* v. *Bailey, supra*, quoting *Lemon* v. *Kurtzman, supra* at 612-613. Although there is considerable doubt about the continued vitality of the test in *Lemon* v. *Kurtzman, supra*, in light of recent decisions of the Supreme Court,[19] we reach this conclusion if we apply that more stringent test.

We reject the defendant's claim that the divorce judgment "established Judaism" as the religion to govern his children's upbringing. In limiting the children's exposure to the defendant's religion, the judge merely recognized the preference that the parties allowed to develop and one that the defendant, until recently, encouraged. Moreover, paragraph 5 was intended for a wholly secular purpose — to limit the emotional harm to the children caused by exposure to negative messages presented by the defendant's religion.[20] Although the judgment contemplates continued court involvement, it does not foster excessive

---

[19]See The Supreme Court, 1996 Term, Fallon, Foreword: Implementing the Constitution, 111 Harv. L. Rev. 56, 85 (1997); The Supreme Court, 1994 Term, Fried, Foreword: Revolutions?, 109 Harv. L. Rev. 13, 68 (1995).

[20]For similar reasons, we reject the defendant's argument that paragraph 6 of the divorce judgment, which requires the guardian ad litem to explain the

government entanglement because the focus of any judicial inquiry will center on the emotional or physical harm to the children rather than the merit-worthiness of the parties' respective religious teachings.

5. *Joint custody.* The plaintiff argues on cross appeal that it was an abuse of discretion to award joint legal custody to the parties. The determination of custody rests within the discretion of the judge. *Vilakazi* v. *Maxie*, 371 Mass. 406, 409 (1976). The material facts found and reported must support the judge's action in awarding joint legal custody to the parties. *Id.* We are mindful of the importance of a trial judge's opportunity to observe and appraise both parents in custody matters. *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958). The plaintiff argues that joint legal custody is inappropriate because she and the defendant are unable to agree on "major decisions regarding the [children's] . . . moral and religious development." G. L. c. 208, § 31. See *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 404-405 (1981) (suggesting joint custody is appropriate where parents are "relatively stable" and "amicable" and agree on basic issues). Because the plaintiff points to no conflict other than the parties' inability to reconcile their views as to the children's religious upbringing, we conclude that she has not established that the judge abused her discretion in granting joint custody.[21]

6. *Property disposition and attorney's fees.* The plaintiff also argues the judge erred in granting the defendant twenty-five per cent of the proceeds on the sale of the jointly owned marital home because her family provided the funds for its purchase. We will not set aside the trial judge's division of marital assets unless an award is "plainly wrong and excessive." *Heins* v. *Ledis*, 422 Mass. 477, 481 (1996). The judge found that the purchase of the marital home was a completed gift to the parties from the plaintiff's parents. The award was well within the proper exercise of her discretion.

The plaintiff also claims that she should have been awarded attorney's fees pursuant to G. L. c. 208, § 38, because the defendant proceeded in a dilatory and vexatious manner. The

court's judgment to the children, is an unconstitutional establishment of religion.

[21]The judge heard considerable testimony over the course of a five-day trial and apparently did not consider the parties unable to cooperate on other child care issues.

judge's decision not to award attorney's fees is within her discretion. *Brash* v. *Brash,* 407 Mass. 101, 106 (1990). Furthermore, she was in a position to observe first hand the defendant's conduct; therefore, we shall not disturb her assessment on the basis of a printed record.

*Judgment affirmed.*