GLORIA SAX *vs.* LAWRENCE J. SAX.

No. 99-P-640.

Essex. May 17, 2001. - February 15, 2002.

Present: BROWN, RAPOZA, & McHUGH, JJ.

*Contempt. Divorce and Separation,* Separation agreement. *Contract,* Separation agreement, Construction of contract.

A "take no action" provision in an agreement incorporated into a judgment of divorce did not provide the "clear and unequivocal demand" necessary to support a later action for contempt. [771-773]

COMPLAINT for divorce filed in the Essex Division of the Probate and Family Court Department on January 21, 1994.

A complaint for contempt, filed on March 16, 1998, was heard by *John C. Stevens, III, J.*

*John S. Legasey* for Gloria Sax.

*David C. Aisenberg* for Lawrence J. Sax.

McHUGH, J. Following protracted and fractious divorce proceedings, Lawrence and Gloria Sax reached an agreement later incorporated into a judgment ending their forty-year marriage. Lasting peace, however, proved elusive. Lawrence soon filed a complaint for contempt alleging that Gloria had violated a provision of the agreement prohibiting her from disclosing what she claimed were Lawrence's pre-agreement financial misdeeds. Denying that she had violated anything, Gloria moved to dismiss the complaint. A judge of the Probate Court agreed with her, allowed her motion, and dismissed the complaint without an evidentiary hearing. Lawrence now has appealed. Being of the opinion that the relevant provision of the agreement was too imprecise to support an action for contempt, we affirm.

The stage-setting facts are these: Lawrence and Gloria were

married on June 12, 1955. Gloria filed a complaint for divorce in January of 1994, and extended litigation ensued. In the course of that litigation, Gloria, among other things, accused Lawrence of making dishonest financial disclosures to the court and engaging in dishonest financial dealings with third parties.

On February 4, 1997, Lawrence and Gloria signed a comprehensive agreement containing, as one might expect, a series of provisions dividing the tangible components of their long marriage. Only a few of those provisions are relevant here. One such provision allowed Lawrence to retain ownership of a piece of commercial real estate on Granite Avenue in Boston, collect the rents, and sell the property if and when he chose to do so. Another provision said that Lawrence was to pay Gloria alimony consisting of fifty percent of each month's net Granite Avenue rents and that he was to divide with her the net proceeds of any sale of the property. Any differences that might arise between Lawrence and Gloria over amounts due and owing and the like were to be resolved through arbitration.

The final provision of relevance was aimed at suppressing Gloria's allegations of Lawrence's alleged financial misdeeds. That provision contained three consecutively-numbered paragraphs, the third of which was a "take no action" provision reading as follows:

> "3. [Gloria] agrees that she will undertake no action or authorize or permit other person(s) with whom she is in privity, or who is her agent, which would cause, encourage or expedite action taken against or with respect to [Lawrence] which would or may result in financial or other jeopardy, for any cause or thing which occurred before the execution of this agreement."[1]

After Gloria and Lawrence signed the agreement, the Probate

---

[1] The first two paragraphs provided an important context for the "take no action" provision. Those paragraphs said:

"1. [Gloria] shall forthwith return to [Lawrence] the original and all copies of tape recordings which she has made of his voice and any and all transcripts which she caused to be made thereof and any and all other documents of any kind or description which she has which she purports to substantiate financial wrongdoing on the part of [Lawrence] during the marriage of the parties.

Court entered a judgment of divorce nisi that subsequently became final. In material part, the judgment said that

> "the signed Agreement of the parties [dated] February 4, 1997 . . . is hereby incorporated but not merged into this Judgment and shall survive as an independent contract. The parties shall comply with the terms thereof."

Although the judgment produced a modicum of tranquility on the domestic front, trouble quickly arose on Granite Avenue. In July, 1997, Lawrence's Granite Avenue tenants, wTe Corporation and wTe Recycling, Inc., whom we shall collectively refer to as "wTe," stopped making rent payments. When discussions failed to trigger their resumption, Lawrence brought suit in Superior Court to collect the rents plus all other amounts to which he claimed entitlement under the lease. Almost as soon as he filed suit, however, Lawrence and wTe began settlement discussions and, by December 19, 1997, a written settlement agreement was on the table.[2]

In timely fashion, Lawrence told Gloria that wTe had stopped paying rent and, in some manner the record does not reveal, she soon learned of the action he had commenced. In September, 1997, she inquired through counsel about whether she should intervene in the Superior Court action to protect her own interests in the net rents and sale proceeds. After her attorney and counsel for Lawrence spoke on the telephone about the matter, she decided not to intervene. She did, however, request that she be kept in "the information loop" and that she be "informed with respect to any offers that may be made to purchase the property."

---

> "2. [Gloria] shall move the Court to impound the file of the parties' divorce matter in its entirety, providing an affidavit in support thereof which comports with the Supplemental Probate Court rule which governs the consideration of such motions."

[2]On December 19, both Lawrence and wTe received a copy of a complaint to foreclose the mortgage a financing bank held on the Granite Street property. Receipt of that notice complicated the settlement negotiations but Lawrence alleges that the complications were surmounted. We need not pause to explore the impact of the foreclosure notice on settlement negotiations, for that exploration would add nothing to an understanding of the issues this appeal involves.

The record contains little regarding any subsequent communications between the lawyers for Gloria and Lawrence about the lawsuit's progress. It does reveal, however, that, on January 26, 1998, Gloria served a motion to intervene on counsel for Lawrence and counsel for wTe. In her motion, Gloria stated, in part, as follows:

> "5. [Gloria and Lawrence] have an adversarial and acrimonious relationship as a result of the dissolution of their marriage. As a result of [Lawrence's] past conduct, [Gloria] is justifiably concerned that if she is not made a party to this action, the payments due under the lease in which she has an interest may be compromised.
>
> . . .
>
> "7. Clearly, [Gloria] has an interest relating to the lease transaction at issue. Additionally, as set forth above, due to the acrimonious nature of the parties' relationship, including [Lawrence's] desire to pay as little to [Gloria] as possible (which might include making side deals with [wTe] in order to defeat [Gloria's] claim), unless [Gloria] is made a party, disposition of the action may, as a practical matter, impair or impede her ability to protect that interest."

Lawrence formally opposed Gloria's motion and informally urged her to withdraw it.[3] Instead, Gloria decided to ratchet things up a notch by serving a reply to Lawrence's opposition in which she stated, in part, that

> "3. . . . [Gloria] is extremely concerned that, behind her back, [Lawrence] will compromise the claim [against wTe], or enter into side deals with [wTe], in order to defeat her rights under the divorce agreement. Her basis for believing same stems from [Lawrence's] consistent conduct in the divorce action, where [Lawrence] attempted to conceal assets from [Gloria], made misrepresentations

---

[3]Counsel for Lawrence, in a letter to counsel for Gloria following Gloria's motion to intervene, said that he had been engaged in serious and productive settlement discussions with wTe, and that Gloria's attempt at intervention had caused, and would continue to cause, serious difficulties with those negotiations.

to both [Gloria] and the court, and acted in other ways in order to mislead [Gloria] as to his income and assets."

The day after serving that reply, Gloria served another reply repeating the quoted language but increasing its punch by alleging that Lawrence had been

"compelled to plead the Fifth Amendment on his financial statement filed with the Probate Court rather than truthfully complete same."[4]

Ultimately, and before the court decided Gloria's intervention motion, Lawrence and wTe settled. Lawrence thereafter filed in the Probate Court a complaint for contempt alleging that the quoted language from Gloria's intervention papers violated the "take no action" provisions of the divorce judgment. In his complaint, Lawrence also alleged that Gloria's revelations caused a $182,500 reduction in the amount for which he was able to settle with wTe and thus cost him personally $91,250 or fifty percent of the settlement differential.[5]

Gloria moved to dismiss the complaint. Over Lawrence's objection and request for an evidentiary hearing, a judge allowed the motion. He concluded that the "take no action" provision was unambiguous and did not prevent Gloria from alluding to Lawrence's pre-agreement conduct in connection with "any cause or thing" that occurred after the agreement was signed. Because Lawrence's post-agreement lawsuit was the "cause or thing" that triggered Gloria's motion to intervene and accompanying revelations, the judge concluded that, as a matter of law, Gloria had not violated the agreement. He therefore ordered entry of judgment dismissing the complaint and, from that judgment, Lawrence has appealed.

Turning from facts to analysis, contempt proceedings in the Probate and Family Court are governed by "the rules of probate

---

[4]The motion and opposition apparently were served and filed with the Superior Court. Gloria served her replies but the record does not reveal whether she filed them. See Superior Court Rule 9A(a)(3) (2001). That gap in the record is of no present consequence.

[5]He thus sought a civil fine in the amount of his losses plus his reasonable expenses. See *Manchester* v. *Department of Envtl. Quality Engr.*, 381 Mass. 208, 215 (1980).

courts applicable to domestic relations matters." G. L. c. 215, § 34A. The referenced rules are the Massachusetts Rules of Domestic Relations Procedure, rule 12(b)(6) of which permits dismissal of a complaint if it fails to "state a claim upon which relief can be granted." Dismissal under rule 12(b)(6), however, is proper only if review of the complaint leads to the certain conclusion "that the pleader is entitled to no relief under any combination of facts which could be proved in support of his claim." *Bahceli* v. *Bahceli*, 10 Mass. App. Ct. 446, 451 (1980).

Gloria maintains that, for two related but mutually exclusive reasons, Lawrence could not under any circumstances have mustered facts entitling him to a judgment of contempt. First, Gloria asserts that the "take no action" language of the agreement unambiguously permits the conduct in which she engaged. Second, she asserts that, if the language is ambiguous, then that language cannot possibly amount to the kind of "clear and unequivocal command" necessary for a finding of contempt. She made the same arguments to the motion judge who, because he agreed with the first, never reached the second.

Taking those arguments in order, the language of the "take no action" provision, whether considered alone or in the context of the settlement agreement as a whole, does not unambiguously yield the interpretation the motion judge gave it. Indeed, the motion judge's interpretation treats the provision as if the phrase "for any cause or thing which occurred before the execution of this agreement" were an independent clause describing a prohibited motivation for Gloria's post-agreement action. Under that construction, Lawrence's pre-agreement acts or omissions were fair game for Gloria if some post-agreement occurrence motivated her to delve into them. Though strained, that construction is plausible.

At the very least, however, it is equally plausible to construe the language, in its setting and given its roots, as if the phrase "for any cause or thing which occurred before the execution of this agreement" were a dependent clause modifying the words "financial . . . jeopardy." Construed in that fashion, the "take no action" provision prohibited Gloria from doing anything,

regardless of the motivation, that would harm Lawrence because of his pre-agreement conduct.[6]

The agreement's "take no action" provision therefore was capable of at least two interpretations, only one of which clearly permitted Gloria's action. The language thus did not unambiguously permit or forbid Gloria's challenged action, and the judge should not have dismissed Lawrence's complaint for contempt on the grounds that it did.

Gloria's second and more persuasive argument proceeds from the unchallenged premise that "[t]o constitute civil contempt there must be a clear and undoubted disobedience of a clear and unequivocal command." *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 36 (1972). *Larson* v. *Larson*, 28 Mass. App. Ct. 338, 340 (1990). To the extent that the language of the "take no action" provision supports more than one meaning and to the extent that those meanings place different boundaries on the action the provision prohibits, the language simply does not provide the "clear and unequivocal command" necessary for a finding of contempt.[7] While agreeing with Gloria's premise, Lawrence disagrees with her conclusion and argues that the evidentiary hearing he requested would have revealed that the parties in fact attached the same meaning to the imprecise words they used to memorialize their agreement.[8]

It is true that the meaning of ambiguous contractual language, even ambiguous contractual language embodied in a judgment of divorce, generally presents a question of fact. See *Parrish* v. *Parrish*, 30 Mass. App. Ct. 78, 86 (1991). See also *Commercial Union Ins. Co.* v. *Boston Edison Co.*, 412 Mass. 545, 557 (1992). Accordingly, if the language is ambiguous, "[e]xtrinsic evidence bearing upon the background and purpose of the par-

---

[6]Were this simply a claim for breach of contract, then determination of the proper interpretation would have been a task for the trier of fact. See *Commercial Union Ins. Co.* v. *Boston Edison Co.*, 412 Mass. 545, 557 (1992); *Parrish* v. *Parrish*, 30 Mass. App. Ct. 78, 86 (1991).

[7]As noted a few paragraphs ago, Gloria made this argument to the motion judge but he found no need to reach it. This court may nevertheless consider it. *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993). *Eresian* v. *Mattei*, 52 Mass. App. Ct. 16, 20 (2001).

[8]Lawrence also argued that the language was unambiguous and unambiguously prohibited Gloria's action. For reasons already stated, we disagree.

ties, as well as their understanding of the meaning of particular language [they] used . . . may be considered both in the construction of ambiguous . . . language and in resolving uncertainties in applying the terms of the written contract to the subject matter." *Parrish* v. *Parrish, supra,* quoting from *USM Corp.* v. *Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108, 116 (1989).

The cases just cited, however, all deal with claims for breach of contract. Contempt is different. In that context, vague or ambiguous language in a judicial decree will not suffice. See, e.g., *Warren Gardens Hous. Coop.* v. *Clark,* 420 Mass. 699, 701 (1995); *Hinds* v. *Hinds,* 4 Mass. App. Ct. 63, 67 (1976). Ambiguities are regularly resolved in favor of the alleged contemnor, *Cohen* v. *Murphy,* 368 Mass. 144, 147 (1975), and cannot be removed by examining the evidence underlying the judgment in which the ambiguous language is found. *Inspector of Bldgs. of Provincetown* v. *Eder,* 11 Mass. App. Ct. 1011 (1981). See *Cepeck* v. *Cepeck,* 22 Mass. App. Ct. 331, 335 (1986).

In part, the requirement for clear and unequivocal language is designed to insure that all who are subject to an order's command have fair notice of the conduct the order prohibits. *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 565-566 (1997). More deeply, though, the requirement stems from a concern that, without the neutralizing bulwark of a jury's interpretive fact finding, ambiguity carries with it the potential for becoming "an instrument of [judicial] severity." *Labor Relations Commn.* v. *Boston Teachers Union, Local 66,* 374 Mass. 79, 89 (1977), quoting from *McComb* v. *Jacksonville Paper Co.,* 336 U.S. 187, 197 (1949) (Frankfurter, J., dissenting).

To be sure, contempt findings have been upheld in cases where the governing order, although requiring "some legal interpretation," was couched in terms that provided clear notice of its boundaries. *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 567, and cases cited. Likewise, such findings have been upheld where, although the operative language was facially unclear, the simple, straightforward, and undisputed facts in the record, including undisputed facts regarding the parties postagreement conduct, clearly showed not only what the language meant but also that the parties shared a common understanding

of that meaning. *Vyskocil* v. *Vyskocil*, 7 Mass. App. Ct. 857, 858 (1979).[9] Far different are cases where the order's language is filled with discretion, e.g., *Pendoley* v. *Ferreira*, 345 Mass. 309, 310, 314 (1963) (prohibiting one party from acting in an "unreasonable manner" or "materially interfering" with another); *Smith* v. *Atlantic Properties, Inc.*, 12 Mass. App. Ct. 201, 210 (1981) (requiring declaration of a "reasonable dividend at the earliest practical date"), or cannot be understood without an extensive review of the evidence, findings, or other background materials on which it is based. See *Carroll* v. *Hinchley*, 316 Mass. 724, 731 (1944) ("A decree should contain within its four corners the mandate of the court without reference to other documents").

In the end, "[a] final decree should be as definite and certain as the circumstances allow in order that a defendant may know what conduct is prohibited and not be subjected to contempt proceedings that might possibly arise out of any ambiguity in the decree." *Building Commr. of Medford* v. *C. & H. Co.*, 319 Mass. 273, 284 (1946). The "take no action" provision of the agreement and resulting judgment is not of that character. Perhaps presentation of evidence could dress it with certainty sufficient to support an action for breach of contract. Nevertheless, it does not contain the "clear and unequivocal command" necessary to support an action for contempt.[10]

---

[9] The rationale for the decision in *Vyskocil* is perhaps broad enough to include taking small quantities of evidence where the parties have included in their agreement a shorthand expression — well understood by them but obscure to outsiders — and some evidence is necessary to decode that expression. Such evidentiary decoding is far less than what is required for interpretation of the "take no action" provision of the agreement we are considering here. ,

[10] The decision we reach makes it unnecessary for us to resolve Gloria's argument that Lawrence's petition should have been dismissed because she is absolutely immune from civil liability for the content of material contained in papers she filed with the court. Nevertheless, and without attempting to resolve that claim, we note two things. First, the cases Gloria cites in support of her claim to absolute immunity are tort cases, chiefly, although not exclusively, cases involving defamation. *Mezullo* v. *Maletz*, 331 Mass. 233, 236 (1954). *Aborn* v. *Lipson*, 357 Mass. 71, 72 (1970). *Sriberg* v. *Raymond*, 370 Mass. 105, 108 (1976). *Correllas* v. *Viveiros*, 410 Mass. 314, 320-321 (1991). *Robert L. Sullivan, D.D.S., P.C.* v. *Birmingham*, 11 Mass. App. Ct. 359, 361-362 (1981). *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct.

Solely for the foregoing reason, the order dismissing Lawrence's complaint for contempt is affirmed.

*So ordered.*

---

137, 140-141 (1996). Restatement (Second) of Torts § 586 (1977). See Restatement (Second) of Torts §§ 587-589 (1977). None of the cases on which Gloria relies deals with a filing that allegedly breaches a contract or violates a court order. Secondly, Gloria relies in part on cases dealing with the breadth of an attorney's immunity from liability. But Gloria's immunity from liability is not necessarily coextensive with that of her lawyer. Indeed, the very existence of the tort of malicious prosecution is witness to the difference in the scope of the immunity, even in tort, enjoyed by lawyers and their clients.