GEOFFREY O'CONNELL *vs.* NANCY GREENWOOD.

No. 01-P-1451.

Middlesex. February 12, 2003. - September 4, 2003.

Present: CYPHER, MASON, & McHUGH, JJ.

*Contempt. Minor,* Custody. *Parent and Child,* Custody. *Probate Court,* Custody
of child.

A Probate and Family Court judge correctly entered a contempt judgment
against a mother who was awarded physical custody of her five year old
son, as well as shared legal custody with the child's father; although the
mother did not violate any clear and unequivocal command of the underly-
ing judgment when she enrolled the child at preschool under another
surname, allowed the child to call his stepfather "Dad" or "Daddy,"
instructed the child's preschool not to release the child to the father, and
exposed the child to different religious teachings and services, a judgment
of contempt was nevertheless supported by the mother's admission that she
disobeyed the underlying judgment's requirement that each parent notify
the other "as soon as possible" of any sickness the child incurred and
provide the other with access to the child during times of illness. [150-153]
A contempt judgment in a child custody case was properly entered against a
mother who failed to produce the subject child for a scheduled holiday
visit with the father pursuant to a clear and unequivocal court order, where
the mother's proffered evidence of the child's illness during the visitation
period fell far short of showing an inability to comply with the underlying
order. [153-154]

COMPLAINT to establish paternity filed in the Middlesex Divi-
sion of the Probate and Family Court Department on January
12, 1996.

Complaints for contempt, filed on October 15, 1999, and
January 11, 2000, were heard by *Beverly Weinger Boorstein,* J.

*Daniel A. Laufer* for the mother.

*Harriet Schechter* for the father.

McHUGH, J. Parental inability to agree on most aspects of an
order for joint legal custody of a five year old boy led to
extended legal proceedings and, ultimately, to two judgments of

contempt against the child's mother, Nancy Greenwood (mother). From those judgments, the mother appeals. We affirm.

Legal proceedings in this difficult case have been in progress since shortly after the child was born on February 13, 1995. The parents were not married at the time, and on January 12, 1996, the mother brought a complaint to establish that the defendant, Geoffrey O'Connell (father), was the child's father. In August of that year, the father formally acknowledged his paternity but intense wrangling over visitation, support and the like continued unabated over the following months and years.

On August 25, 1999, a judge of the Probate and Family Court ordered entry of a paternity judgment that gave the mother physical custody of the child but awarded shared legal custody to both parents, reserving, however, to the mother the final say on medical decisions. The judgment also contained a detailed schedule of weekly and holiday visits, later made even more detailed and explicit when the parents could not agree on what the seemingly clear terms of the August 25 judgment meant. Finally, the judgment granted each parent the right to provide the child with emergency medical care and required each to notify the other promptly when the child was sick and to give the other access to the child at such times.

Less than two months after the judgment entered, the father filed a complaint for contempt alleging that the mother had enrolled the child in school under the name "Greenwood," the name she had taken upon her late 1998 or early 1999 marriage to Shaun Greenwood, that she had instructed administrators at the child's school not to release the child to the father, and that she had insisted that the child call her new husband "Daddy." Shortly thereafter, the father amended the complaint to add allegations that the mother failed to inform him when the child was sick and that she was taking the child to new "religious training" without his permission.

In response to the complaint, the judge held a preliminary hearing. After the hearing, she issued an "Order on Contempt" on December 13, 1999. That order, among other things, required the mother to refer to the child by the name O'Connell Santoro, Santoro being the mother's maiden name; "direct" that school and other records refer to the child as O'Connell Santoro; cease

"instructing, encouraging or condoning the child calling her husband . . . 'Dad' or 'Daddy' ''; notify the father when the child was sick; and refrain from changing the child's religion without the father's consent.[1] In addition, the judge set March 6, 2000, as the date for a hearing on the merits of the contempt complaint.

On January 11, 2000, the father filed a second complaint for contempt alleging the mother had failed to produce the child for a court-ordered visit between December 29, 1999, and January 2, 2000, and for a regularly scheduled weekend visit; failed to inform him that the child was sick; and failed to allow him to have access to the child by telephone.

The two contempt complaints were heard together on March 6, 2000, as scheduled.[2] On March 17, 2000, the judge issued findings of fact and conclusions of law that essentially accepted the father's allegations and detailed her basis for doing so. Judgments issued the same day holding the mother in contempt, requiring her to pay attorney's fees totaling $2,037.50, and requiring her to attend counseling designed to help her accept the father's role in the child's life.

Turning from background to analysis of the mother's appellate claims, we begin by noting that "[a] civil contempt consists in failing to do something which the contemnor is ordered by the court to do." Dangel, Massachusetts Jurisprudence, Contempt § 3, at 3 (1939). When presented with a complaint for contempt, the court must first consider whether the order at issue provided the alleged contemnor with a "clear and

[1]The judge made no contempt finding as a predicate for the December 13 order, nor did she make any findings of fact or conclusions of law. On appeal, the mother makes no issue of the manner in which the December 13 order was issued, undoubtedly because, regardless of its label, the order was of a type the court's continuing jurisdiction over paternity proceedings empowered it to enter. G. L. c. 215, § 34.

[2]That hearing was combined with a hearing on the mother's application for a restraining order under G. L. c. 209A and the father's complaint for a change in physical custody from the mother to himself. On March 10, 2000, the court entered a temporary order awarding the father sole physical and legal custody of the child. When the mother responded to that order by taking the child to North Carolina, the court suspended her visitation rights. Later, the court entered an order providing for supervised visitation. The mother does not appeal from any of those orders.

unequivocal command" to refrain from the allegedly contumacious conduct. *Manchester* v. *Department of Envtl. Quality Engr.*, 381 Mass. 208, 212 (1980), quoting from *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. 35, 36 (1972). Only a clear and unequivocal order provides "all who are subject to [the] order's command [with] fair notice of the conduct the order prohibits." *Sax* v. *Sax*, 53 Mass. App. Ct. 765, 772 (2002). The requisite unequivocal clarity requires more than a general statement that might or might not include the accused's conduct. See *Warren Gardens Hous. Coop.* v. *Clark*, 420 Mass. 699, 701 (1995) (general order to "adequately supervise" children provided insufficient notice that particular omissions constituted inadequate supervision).

If the complainant establishes that the contemnor had "fair notice" of the court's directive, *Sax* v. *Sax*, 53 Mass. App. Ct. at 772, he or she must then show that the order was undoubtedly disobeyed. *Warren Gardens Hous. Coop.* v. *Clark*, 420 Mass. at 700.[3] Those who seek a finding of contempt must prove their case by a preponderance of the evidence. *Manchester* v. *Department of Envtl. Quality Engr.*, 381 Mass. at 212; Bishop, Prima Facie Case § 62.3, at 458 (4th ed. 1997).

On review, we give "due regard" to the trial judge's ability to judge the witnesses' credibility and set aside the judge's factual findings only if they are clearly erroneous. Mass.R.Dom. Rel.P. 52(a) (1987). However, "[w]e scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Kendall*, 426 Mass. 238, 242 (1997), cert. denied, 524 U.S. 953 (1998).

With those principles in mind, we first conclude that the August 25, 1999, paternity judgment did not contain commands

---

[3]Given the view we take of the case, we have no need to resolve unsettled questions regarding the kind and degree of intent that must be shown to support a judgment of contempt. See *McComb* v. *Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). See also *Commonwealth* v. *Delaney*, 425 Mass. 587, 596 (1997), cert. denied, 522 U.S. 1058 (1998), quoting from *United Factory Outlet, Inc.* v. *Jay's Stores, Inc.*, 361 Mass. at 45 (Tauro, C.J., concurring) ("[T]he rule that intent is not an element of civil contempt is a direct consequence of the separate functions of criminal and civil contempt"); *Commonwealth* v. *Silva*, 431 Mass. 194, 200 (2000). But see *United Factory Outlet, Inc.*, *supra* at 38-39 (declining to decide whether absence of "wilfullness" requirement for corporate contempt extends to individuals).

of sufficient clarity to support the first of the two contempt judgments the judge issued on March 17, 2000. In entering the first contempt judgment, the judge, as noted, essentially accepted the father's allegations regarding the mother's conduct and found that the mother contemptuously

> "enrolled the child at preschool under the name of 'Greenwood'; instructed the school to not release the child to [the father] under any conditions; insisted the child refer to her husband as Daddy; failed to inform the plaintiff when the child is sick; [and took] the child to religious training objected to by the joint custodian contrary to court order."

But the August 25 judgment did not prohibit any of that conduct save failing to inform the father of the child's illness. The judgment said nothing about the name the mother was to use when enrolling the child in school or elsewhere and was entirely silent on whether, in the event of the mother's marriage, the child could refer to her husband as "Daddy." By itself, an order for joint legal custody carries with it no clear mandate as to the name a child is required to use, see generally, e.g., *Cramer* v. *Hirsch*, 18 Mass. App. Ct. 986, 987 (1984); *Richards* v. *Mason*, 54 Mass. App. Ct. 568, 569-572 (2002), and such orders say — indeed, they imply — nothing about the name a child may use for a stepparent.[4]

Likewise, the August 25 paternity judgment did not clearly and unequivocally prohibit the mother from instructing the child's preschool not to release the child to the father. That judgment gave the mother physical custody of the child and gave the father visitation on specified evenings, weekends, and holidays. It is undisputed that the child's school day ran from 8:30 A.M. to 11:30 A.M. The judgment, therefore, placed the child in the mother's physical custody when school started, as it progressed, and when it ended. The August 25 judgment simply

---

[4]The later order of December 13, 1999, did give specific direction to the mother as to the name she was required to instruct school personnel to use. That order, however, was entered long after the mother "enrolled" the child in school and, in any event, was not the basis of the complaint for contempt. Moreover, that order addressed none of the issues addressed in *Richards* v. *Mason*, *supra*, a decision manifestly unavailable to the judge on December 13, 1999.

cannot be read to contain a command that was incongruent with the custody arrangements the judgment itself expressly imposed.[5]

Finally, although the August 25 judgment said nothing about religious training, "joint" or "shared" legal custody, which the judgment did mandate, is statutorily defined as "continued mutual responsibility and involvement by both parents in major decisions regarding the child's welfare including matters of . . . religious development." G. L. c. 208, § 31, as amended by St. 1989, c. 689. The evidence was to the effect that the child had been baptized a Roman Catholic and that the mother and father had agreed to raise him in that faith. When the mother married, however, she unilaterally, without consulting the father and over the father's ultimate objection, began to take the child to religious services, four times weekly, at a nondenominational church where her husband worshiped and where she became employed.[6]

Although the concept of shared legal custody gives both

---

[5] Again, the December 13 modification of the August 25 judgment explicitly directed the mother to tell the school to release the child to the father in an emergency if the mother were unavailable. But the father's complaint for contempt was filed before December 13 and alleged only a violation of the August 25 judgment. Neither before nor after trial was that complaint ever amended to assert claims for violation of the December 13 order. See Mass.R. Dom.Rel.P. 15(b) (1975).

[6] The father testified that, after the child began attending the new church, he told the father, "It's the Devil's world, and the Devil makes you lie in court, Dad. You're going to burn in the Devil's lake of fire." In her findings, the judge stated that "[s]uch language, from a five year old, is of great concern to this Court." Apart from noting her concern, the judge did not make any findings regarding the impact of the religious regimen on the child's well-being. See generally *Kendall* v. *Kendall*, 426 Mass. at 243. Compare *Felton* v. *Felton*, 383 Mass. 232, 239-240 (1981). In her December 13, 1999, order, the judge had prohibited the mother from changing "the child's religion from Roman Catholic without written consent of" the father. After the trial, the judge found that despite that order, "there [was] no indication that Mother has ceased taking the child to a non-Catholic Church." Apparently, therefore, the judge took into account, at least on the issue of religion, the mother's compliance with the December 13 order even though the complaint sought to hold her in contempt solely for alleged violations of the August 25 paternity judgment. See note 5, *supra*. She also apparently assigned to the mother the burden of proving that she did not violate the December 13 order, compare *Sagar* v. *Sagar*, 57 Mass. App. Ct. 71, 76-77 (2003), and apparently equated the child's attendance at the nondenominational church with a change in the child's religion from Roman Catholic.

parents a responsibility for a child's religious development, that concept does not provide either with a veto over exposure to disagreeable religious beliefs. On the contrary, neither parent's constitutional right to practice a particular religion and to expose a child to the parent's religious beliefs may be restricted absent a demonstrated and compelling State interest in the restriction. *Kendall* v. *Kendall*, 426 Mass. at 243. *Sagar* v. *Sagar*, 57 Mass. App. Ct. 71, 75-76 (2003). Such an interest may exist if exposure to a particular religious belief or practice causes the child substantial injury. *Felton* v. *Felton*, 383 Mass. 232, 235 (1981).

Because a particularized showing is necessary to restrict a parent's right to expose a child to the parent's religious beliefs, the general principle of shared parental responsibility for religious development inherent in the concept of joint legal custody did not, and could not, amount to a clear and unequivocal command that the mother expose the child to nothing but Roman Catholic beliefs and practices. The August 25 paternity judgment, therefore, cannot support a judgment of contempt based on the mother's exposure of the child to nondenominational teachings and services.

The August 25 judgment did, however, clearly require each parent to notify the other "as soon as possible" of any sickness the child incurred and provide the other with access to the child during times of illness. With respect to that command, the question, thus, becomes whether the evidence showed the mother's clear and undoubted disobedience. It did. Although there was conflicting testimony regarding the nature of the mother's compliance, she, herself, admitted one instance of noncompliance for which she claimed no excuse. That admission, by itself, was sufficient to find her in contempt.

The second March 17, 2000, judgment holding the mother in contempt centered on the mother's failure to produce the child for a scheduled holiday visit with the father.[7] The record contains a clear and unequivocal court order for the child to

---

[7]The judgment of contempt was also based on what the judge found was the mother's denial of the father's access to the child after December 29, 1999, while the child was ill and for failing to inform the father of the child's illness. We need not extend this opinion by examining the evidentiary bases

spend December 29, 1999, to January 2, 2000, with the father
and it is undisputed that the mother did not allow the child to
be with the father during that period.

The mother, however, asserted that the child was sick during
the visitation period, a fact that the father does not dispute, and
proffered a physician's note stating that he had seen the child
on four occasions between December 29, 1999, and January 19,
2000, and had "instructed mother to restrict his activity to
home because of his illness during this period of time." The
mother offers the child's illness and the physician's instruction
as a permissible basis for her election not to allow the father to
have the child during the required visitation period.

A putative contemnor may no doubt avoid a finding of
contempt if she meets her burden of proving her inability to
comply with the relevant court order. *Diver* v. *Diver,* 402 Mass.
599, 603 (1988). Cf. *Krapf* v. *Krapf,* 439 Mass. 97, 110 (2003);
G. L. c. 215, § 34. But the mother's evidence in this case falls
far short of showing an inability to comply. She failed to show,
for example, that the sick child could not have rested just as
quietly and comfortably with the father as with the mother or
that transportation between the mother's house and the father's
would have exacerbated his illness or retarded his recovery.
There is no showing that she even inquired of the doctor on
those subjects. Her failure to do so dooms her effort to upset the
contempt judgment on grounds of inability to comply, particu-
larly given the judge's unchallenged finding that the father had
"proven . . . that he [was] equally capable of addressing [the
child's] medical needs" and that the mother "refuses to involve
[him] in [the child's] medical treatment."[8]

We address one final issue before concluding. As the father
asserts for the first time here, there may be instances where one

---

for those findings, both of which the mother challenges, because our conclu-
sion that there is one sound basis for the second contempt judgment is suf-
ficient to validate it. Cf. *Shear* v. *Gabovitch,* 43 Mass. App. Ct. 650, 688
(1997).

[8]In many cases, it may be obvious that moving a sick child will have a
materially adverse impact on his or her health or comfort. It is not obvious
here. The child had been chronically ill; both parents had developed skills in
dealing with the illness, and the judgment, originally and as modified,
recognized that skill.

parent's actions do not violate specific components of an order for shared legal or physical custody and yet, in the aggregate, so fully and completely seek to exclude the other parent from the child's life that they violate the very premise on which the order is based. We do not resolve the issue because it was not raised in the trial court and it was not the theory on which the case was pleaded or tried. See *Trustees of the Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass. 562, 565 (1976); *Fern* v. *Immergut*, 55 Mass. App. Ct. 577, 581 n.9 (2002).

Nevertheless, we make two observations. First, a court order for parents to share custody with one another provides both of them with clear notice that they have "equal rights and responsibilities regarding major decisions" in the child's life. Joint Custody and Shared Parenting 7 (Folberg ed., 1984). A parent whose actions flout this clear and unequivocal right is not immune from a court's equitable powers simply because each particular act is not among those listed in the custody order. Where one joint custodian has clearly undertaken a campaign to exclude the other from making major decisions in the child's life, a contempt judgment may conceivably be warranted.

Second, orders for joint custody, physical or legal, cannot succeed without a true commitment to collaboration rarely produced by the hammer of contempt.

> " 'Although complete agreement between parents to implement joint custody may not be necessary,' in order to be effective 'joint custody requires two capable parents with some degree of respect for one another's abilities as parents, together with a willingness and ability to work together to reach results on major decisions in a manner similar to the way married couples make decisions.' "

*Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 405 (1981), quoting from Taussig & Carpenter, Joint Custody, 56 N.D. L. Rev. 223, 234 (1980). Consequently, in the face of "overwhelming undisputed evidence of hostility between the parents and their disagreement on matters pertaining to the child," *R.H.* v. *B.F.*, 39 Mass. App. Ct. 29, 43 (1995), *S.C.*, *Custody of Vaughn*, 422

Mass. 590 (1996), the child's best interests, always the paramount concern, are likely better served by ending the joint custodial arrangement, upon appropriate findings regarding those interests, than they are by coercive proceedings aimed at forcing the parties into a cooperative relationship they appear incapable of maintaining.

The judgments are affirmed. Both parties shall pay their own costs and attorney's fees for this appeal.

*So ordered.*