Roach, Christine M., J.
Following bench trial on April 17, 2009, and review of all testimony, exhibits, stipulations of the parties and post-trial filings completed May 1,2009, the court finds and rules as follows with respect to the Complaint for Contempt (Contempt Complaint) against Plaintiff Malcolm Whitman, D.M.D. (Dr. Whitman).
FINDINGS OF FACT
All of the below-enumerated Findings of Fact represent findings by the court, including but not limited to determinations of the credibility, weight, and probative value of the evidence adduced at trial and reasonable inferences drawn from that evidence.
Procedural Background
1. From approximately April 2004 to approximately May 2008 the parties engaged in dental practice together. Mrs. Whitman is not a dentist, but she worked in an administrative capacity for the practice for a period of time.
2. Following a series of disputes in 2008, the details of which are not relevant to the Contempt Complaint, an irretrievable breakdown occurred in the professional relationship. The underlying lawsuit here grew out of that breakdown.
3. Plaintiff Dr. Whitman sued in June 2008, inter alia for breach of the parties’ contract agreements. Among those agreements was a Personal Non-Competition and Non-Solicitation Agreement signed by Dr. Whitman on April 2, 2004 (non-compete).
The terms of the non-compete are not disputed in this contempt proceeding. Dr. Whitman admits that when he began working at the Uxbridge Family Dental practice (Uxbridge) in June 2008, he knew that office was within a fifteen (15) mile radius of Dr. Goldberg’s practice. There is no allegation that the parties agreed to modify the non-compete at any time, and there is no allegation for purposes of this contempt proceeding that any other term of the non-compete was violated.
4. As an integral part of the initial legal skirmishing, Dr. Goldberg filed a motion for temporary restraining order/preliminaiy injunction to prevent Dr. Whitman from, among other things, practicing dentistry within a fifteen (15) mile radius of Dr. Goldberg’s Milford office, in violation of the non-compete. The motion was scheduled and heard over a series of dates in July and August 2008, and was ultimately decided in Dr. Goldberg’s favor. The order at issue here was first written and appeared on the docket August 28, 2008. Notice was mailed September 9, 2008. Docket, at Paper 14.[1] Dr. Whitman then moved for reconsideration (with respect to a bond question), and also sought a Petition for Relief from Injunction in the Appeals Court.
5. The parties agree Dr. Whitman was put on notice by his counsel of an impending injunction order by no later than September 11, 2008. The parties further agree counsel accepted service of the order on behalf of Dr. Whitman on September 23, 2008. Trial Exhibits 1-4.
6. A court order (Moriarty, J.) dated September 9, 2008 states as follows:
*290 The Court finds the geographical restriction contained in section 1(a) of the non competition agreement to be reasonable and accordingly a preliminary injunction shall issue enforcing said provision.
Trial Exhibit 4 (attachment) (the Order).
Compliance with the Order
7. Dr. Whitman was served with a copy of the Order on September 23, 2008. It is undisputed he engaged in certain practices of dentistry in the Uxbridge office after that date. At issue is what that practice consisted of, and why he did so. Also of some dispute between the parties is what communications were had by counsel for the parties between September 11, 2008, when Dr. Whitman was advised by counsel that the court had approved the motion for preliminary injunction, to October 3, 2008 when the Contempt Complaint was filed. Whitman Trial Testimony; Trial Exhibits 2-4.
8. Attorney Roy A. Bourgeois for Dr. Whitman and Attorney David B. Stein for Dr. Goldberg held at least two telephone conversations between September 11, 2008 and September 29, 2008 on the subject of Dr. Whitman’s continuing to practice dentistry for certain patients and certain procedures. Three letters are in evidence before me memorializing those conversations. Trial Exhibits 1, 5 and 6.
9. The first letter, dated September 12, 2008, from Mr. Bourgeois to Mr. Stein states in relevant part; “Confirming our telephone discussion yesterday. I have advised Dr. Whitman that the preliminary injunction was approved by the Court and is expected to issue shortly. I understand that he has some complex procedures under way for some patients which he needs to follow and finish up for professional reasons. Beyond that, he will stop working at his current location shortly.” Trial Exhibit 1.
10. The second letter is dated September 29, 2008 from Mr. Stein to Mr. Bourgeois. That communication states in relevant part: “It appears that Dr. Whitman continues to work at the Uxbridge Dental Practice, despite the court’s Order on Defendant’s Motion for Preliminary Injunction, dated September 9, 2008. It is imperative that this situation be rectified immediately. Please be advised that if Dr. Whitman continues to practice dentistry at the Uxbridge location, I have been instructed to seek any and all appropriate damages and sanctions against Dr. Whitman.” Trial Exhibit 5.
11. The third letter is dated September 29, 2008 from Mr. Bourgeois to Mr. Stein. It states in relevant part: “I have previously informed you that Dr. Whitman was engaged in several complex procedures in the practice at Uxbridge which as a matter of his professional responsibility to the patients, he is required to finish and cannot easily transfer to another doctor. If you feel that this is a matter that we have to go and see Judge Moriarty for clarification on, I will do so. It is my understanding that it relates only to a few patients and he is not seeing patients generally in Uxbridge." Trial Exhibit 6 (emphasis supplied).
12. A fourth letter also sheds light on the communications between the parties during this time period. On October 3, 2008, Mr. Stein provided Mr. Bourgeois, by facsimile and certified mail, a courtesy copy of the Contempt Complaint. Mr. Stein’s cover letter includes the following sentence; “ Clearly, we have been patient over the past several weeks, however, it does not appear that your client understands the magnitude of his continuing violation of the Order.” Trial Exhibit 7 (emphasis supplied).
13. Nonetheless, the parties dispute whether, when, and to what extent Dr. Goldberg acquiesced in, or agreed to, Dr. Whitman’s continuing a limited practice, and if Dr. Goldberg did so agree, for which procedures and over what period of time. Each side sought to present testimony from his respective first chair trial counsel on these issues, to be questioned on the stand by opposing counsel, and then each by his own law partner.
14. Given all of the circumstances on the record of the underlying case, of which I took and continue to take judicial notice, including the extensive and ongoing discovery disputes, and counsels’ various representations to the court during this contempt trial that their relationship was marked by “misunderstandings,” “breakdown,” and “explosion,” the court declined to entertain counsel’s testimony, but accepted the stipulated correspondence offered as admissible.[2]
15. The parties do agree that, if the operative date of the Order was September 23, 2008, when Dr. Whitman was served with the Order by counsel, then any discussions between the lawyers during the period September 12 to September 23 are not material to the start date of Dr. Whitman’s alleged contempt. Dr. Whitman nonetheless points in his post-trial brief to a September 26, 2008 conversation between counsel, in which he claims “the plan for winding down his practice and his ethical responsibilities were discussed in detail.” Dr. Goldberg’s position is that the entire substance of the understandings between counsel is memorialized in the letters, and thus no live testimony of counsel was necessary.
Dr. Whitman’s Continued Practice
16. Dr. Whitman admitted before the court that he continued a limited practice of dentistry at Uxbridge following both notification of the court’s decision and service of the Order. Dr. Whitman’s last day of work in Uxbridge was October 3, 2008. Whitman Trial Testimony.
17. Dr. Whitman described this practice as follows: “Complex procedures” refers to procedures that required multiple visits over an extended period of time that had been already started by him and that were not yet completed. Examples of complex procedures *291 include fabricating dentures for a patient and crown and bridge procedures. Whitman Trial Testimony.
18. Dr. Whitman testified he was involved in “several” such procedures for patients as of September 12, 2008, and when pressed stated that by several he guessed twelve to fifteen. Whitman Trial Testimony.
19. Review by Dr. Whitman of a “Provider History Report” led him to identify for the court a series of patient encounters which he testified fell into the “complex procedure” category; for the period September 12, 2008 through September 23, 2008 there are six (6) such entries. Trial Exhibit 8.
20. Dr. Whitman also stated some of the complex procedures were begun prior to the dated entries on the Provider History Report (which begins with August 21, 2008). Whitman Trial Testimony; Trial Exhibit 8.
21. Further muddying the waters, Dr. Whitman testified that the entries on the Provider History Report represent when the particular treatment was “billed out, ” but that was not necessarily when that treatment began, or when it ended. Nonetheless, the Provider History Report is accurate in that Dr. Whitman saw the patients listed for treatment on the days indicated. Id.
22. Dr. Whitman admitted that as of September 12, 2008, he was also seeing “some” patients “generally,” in Uxbridge, beyond those with the complex procedures in process he described. More specifically, Dr. Whitman admitted that between being served with the Order on September 23,2008, until he ceased working as a dentist in Uxbridge on October 3, 2008, he was seeing “only general patients.” Thus, Dr. Whitman admitted that the understanding communicated by his counsel to counsel for Dr. Goldberg, on September 29, 2008, that “he [Dr. Whitman] is not seeing patients generally in Uxbridge,” was not true. Whitman Trial Testimony; Trial Exhibit 6.
23. For example, Dr. Whitman was performing initial “comprehensive oral evaluations” for first-time patients of Uxbridge, and he was performing routine “periodic evaluations" for patients who arrived at Uxbridge for six-month cleaning appointments. Dr. Whitman was also doing fillings. None of these clinical services were the “complex procedures” which Dr. Whitman believed should be exempt from the Order. Whitman Trial Testimony; Trial Exhibit 8.
24. In addition to patients with “complex procedures” and new patients he saw “generally,” Dr. Whitman also testified for the first time to a third category of patient he saw during the relevant time period, by his testimony, between September 12, 2008 and October 3, 2008: “I had concerns about the patients’ rights to be able to seek treatment where they chose. Many of these patients were patients that — even though they were not complex procedures, if I had done a number of restorations for them and they knew that I was leaving the practice, they wanted me to do as many or finish as many as I could before I did actually leave. So I was concerned about their concerns.” Whitman Trial Testimony.
25. At some point “shortly after” September 12, 2008, Dr. Whitman told the owner of Uxbridge that “it looked like I [Dr. Whitman] was going to have to start winding down the practice, that action had been taken to prevent me from working there ... we were going to start to condense the schedule, that I wasn’t going to start to treat new patients or start any long procedures on any new patients that I was going to try to continue to be there to cover for the patients that were coming in for their cleanings, that needed examinations, and that there was going to be a point in time when 1 was going to need to stop working there. At that point I wasn’t sure when that exact date was going to be.” Whitman Trial Testimony.
26. Sometime in late September 2008, Dr. Whitman notified Uxbridge that he could no longer work there. Dr. Whitman testified that during this second period, through to October 3, 2008, he was seeing fewer patients, and was “doing the [dental] examinations because I was the only dentist in the office, and the patients that were coming in for their cleanings needed, required and requested to be examined by a doctor.” Dr. Whitman saw in excess of eighty (80) patients between September 24, 2008 and October 3, 2008, only four (4) of which were seen for “complex procedures.” Whitman Trial Testimony; Trial Exhibit 8.
27. Dr. Whitman stopped working on the same day, October 3, 2008, that he was served with the Contempt Complaint. He testified it was a “hard question to answer” why he stopped that day: “It was the end of the week. It was — I had finished some of the cases that I had been working on, and I knew that there was going to be an end point when I needed to stop completely after finishing up as much as I could at that time.” Dr. Whitman also testified the October 3 date had been chosen “maybe two weeks prior to that,” but elsewhere admitted the filing of the Contempt Complaint “was probably the major reason” he stopped working at Uxbridge. Whitman Trial Testimony.
Dr. Whitman’s Professed Ethical Conflict
28. Family Dental had two other offices during the relevant time period, one in Putnam, Connecticut, and one in Worcester, Massachusetts. Those offices were staffed by other dentists. The vast majority of patients Dr. Goldberg saw in Uxbridge had been served by other dentists in the past. Whitman Trial Testimony.
29. Other dentists who worked at Family Dental’s other offices could have completed the “complex procedures” Dr. Whitman had begun for Uxbridge patients. However, up until October 3, 2008, no substitute dentist staff was provided by the practice; *292 there were “fill-in” dentists only. Whitman Trial Testimony.
30. Dr. Whitman believed he had a “conflict and problem” as between the Order and his feeling that “I should be adhering to an ethical and moral obligation that I had set for me under the Standards of Ethics and Professional Conduct that the American Dental Association has regarding leaving patients in the middle of treatment.” Whitman Trial Testimony; Trial Exhibit 9.
31. Dr. Whitman discussed this problem with his counsel. As a result of those discussions, and the procedural aspects of potential appeal and/or reconsideration of the Order, “it was never very clear in [Dr. Whitman’s] mind that there was a specific date, even though I knew it was going to be somewhere soon, that I needed to physically not be in that office any longer. But I was led to believe that at least for the immediate couple of weeks after that [September 11, 2008 notification by counsel], I would be able to finish up these cases.” Whitman Trial Testimony; Trial Exhibit 1.
32. Dr. Whitman did not communicate the fact of the impending Order and the “wind down” to the owner of Uxbridge Family Dental until “probably a week or so after” September 12, 2008. Based on that conversation a week or so after September 12, 2008, it was Dr. Whitman’s understanding that the office could not replace him with another dentist “for (yet another] couple of weeks or so.” Whitman Trial Testimony.
33. In support of his view of an ethical conflict posed by the Order, Dr. Whitman cited to a provision of a document entitled “Principles of Ethics and Code of Professional Conduct” of the American Dental Association which states as follows: “Patient Abandonment. Once a dentist has undertaken a course of treatment, the dentist should not discontinue that treatment without giving the patient adequate notice and the opportunity to obtain the services of another dentist. Care should be taken that the patient’s oral health is not jeopardized in the process.” Trial Exhibit 9 at page 5, section 2F.
34. The available documentary evidence is consistent with a finding that Dr. Whitman was actively practicing dentistry in Uxbridge during the period September 12, 2008 through October 3, 2008, and that the overall volume of patients he saw did not significantly decrease. The Provider History Report suggests that, as that time period wore on, Dr. Whitman performed fewer “complex procedures,” and more general dentistry and filling work. Aside from inferences that might be drawn from the clinical descriptions, the record does not otherwise indicate which among the patients seen by Dr. Whitman during this period (over one hundred (100) patients between 9/12/08 and 9/23/08, and over eighty (80) patients between 9/24/08 and 10/3/08) were ongoing patients of his own, versus new patients to the practice. Trial Exhibit 8.
35.No evidence was presented at trial that any patient’s oral health was jeopardized, or would have been jeopardized, by compliance with the Order.
LEGAL STANDARDS
1. Proceedings for civil contempt are governed by Mass.R.Civ.P. 65.3. Until very recently, the burden of proof in a contempt action was on the complainant to prove its case by a preponderance of the evidence. Judge Rotenburg Educ. Ctr. v. Comm’r of Dept. of Mental Retardation, 424 Mass. 430, 443 (1997). Beginning with the issuance of the rescript in In re Birchall, 454 Mass. 837 (2009), the Supreme Judicial Court now requires a civil contempt finding be supported by “clear and convincing evidence of disobedience of a clear and unequivocal command.” Id. at 852-53.
2. To constitute civil contempt, there must be a “clear and undoubted disobedience of a clear and unequivocal command.” Warren Gardens Housing. Coop. v. Clark, 420 Mass. 699, 700 (1995), quoting United Factory Outlet, Inc. v. Jay’s Stores, Inc., 361 Mass. 35, 36 (1972). The order must be sufficiently clear to provide the party with unequivocal notice of the conduct that is required or prohibited. Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 565 (1997); Warren Gardens, 420 Mass. at 701. Where the order is ambiguous or the disobedience is doubtful, there cannot be a finding of contempt. Judge Rotenberg, 424 Mass. at 443; Building Inspector of Peabody v. Northeast Nursery, Inc., 418 Mass. 401, 406 (1994).
3. Dr. Whitman may therefore be held liable for contempt if it is found by clear and convincing evidence that: (1) he had actual notice of the Order; (2) the Order was a clear and unequivocal command; and (3) the actions of Whitman constituted a clear and undoubted disobedience of that clear and unequivocal command. Demoulas, 424 Mass. at 565-70.
4. Since the purpose of civil contempt is primarily remedial, there is no requirement that the complainant show an intention to defy the court or to degrade its process. It is enough if he shows the defendant violated the terms of an unambiguous decree. The absence of willfulness will not purge civil contempt; it is enough to establish that the individual defendant was responsible for acts constituting a violation. United Factory Outlet, 361 Mass. at 37-38, and 40-41 (Tauro, J. concurring); O’Connell v. Greenwood, 59 Mass.App.Ct. 147, 150 n.3 (2003).
5. In certain limited circumstances failure to comply with an Order may be determined not to constitute disobedience, when there is an absence of the ability to comply. The burden of proof on the ability issue is on the contempt defendant. DeMoulas, 424 Mass. at 569 (defendant who believes injunction unclear bears the responsibility of seeking clarification from the court before acting). Cf. Diver v. Diver, 402 Mass. 599, *293 603 (1988) (addressing “ability" in the context of probate support orders).
6. In a civil contempt proceeding in Massachusetts, the alleged contemnor’s good faith and/or reliance on advice of legal counsel is irrelevant; all that must be proved is that the alleged contemnor violated the order. Judge Rotenberg, 424 Mass. at 453; United Factory Outlet, 361 Mass. at 38.
7. When considering a contempt complaint, the court focuses primarily on the language of the order. Peggy Lawton Kitchens, Inc. v. Hogan, 403 Mass. 732, 734-35 (1989). The court will not read additional terms into an order, and will not hold the defendant in contempt if, in order to do so, the scope of the underlying order would be expanded beyond its plain meaning. Demoulas, 424 Mass. at 566. See Judge Rotenburg, 424 Mass. at 449; Peggy Lawton Kitchens, 403 Mass. at 734-35. However, the court cannot allow a party to do indirectly what an order makes clear he cannot do directly. A contempt finding is appropriate where steps are taken to subvert the decree. Judge Rotenberg, 424 Mass. 430 at 449; Mohamad v. Kavlakian, 69 Mass.App.Ct. 261, 265-66 (2007).
8. The doctrine of judicial estoppel is an equitable remedy to protect against litigants “playing fast and loose with the courts” by taking inconsistent positions before the court in legal strategy or argument, and then seeking to benefit their interests thereby. Whether the elements of judicial estoppel have been met is a question of law for the court. Feerick v. Matrix Moving Systems, Inc., 302 Wis.2d 464, 736 N.W.2d 172 (2007).
9. The purpose of civil contempt proceedings is remedial, and the formulation of the remedy is within the court’s discretion. Demoulas, 424 Mass. at 571; Eldim, Inc. v. Mullen, 47 Mass.App.Ct. 125, 129 (1999). Compensatory fines for contempt are measured by the actual monetary losses inflicted on the injured party by the wrongful conduct of the contemnors. Godard v. Babson-Dow Manufacturing Co., 319 Mass. 345, 349-50 (1946).
10. Attorneys fees and costs are an appropriate element of a successful civil contempt proceeding. They are the court’s means of compensating the contempt plaintiff for costs incurred as a consequence of the defendant’s violation of the court order. Such awards are proper whether or not the underlying violation is found to have been willful, and are within the court’s remedial discretion. Judge Rotenberg, 424 Mass. at 468; Demoulas, 424 Mass. at 571; Ventresca v. Town Manager of Billerica, 68 Mass.App.Ct. 62, 65 (2007); Eldim, 125 Mass.App.Ct. at 130-31.
RULINGS
1.Dr. Whitman ceased practicing dentistry in Uxbridge on October 3, 2008, because he was served with the Contempt Complaint, and for no other reason. I do not credit his testimony that the date had been chosen in advance.
2. Dr. Whitman genuinely believed he had certain ethical obligations to certain of his patients who were in the midst of complex procedures to provide them with continuation of care. However, Dr. Whitman took no reasonable steps to seek out alternative care for these patients. Dr. Whitman knowingly chose to accommodate these patients by continuing to practice in Uxbridge himself, in clear violation of his non-compete with Dr. Goldberg, and ultimately in clear violation of the Order.
3. Dr. Whitman continued to practice dentistry “generally,” with patients new to him, throughout all of September and into October 2008, well beyond working on the so-called complex procedures. He did so because he determined the Uxbridge practice needed a dentist, and could not readily procure another, not because he held any good faith ethical obligations to new patients of the practice.
4. The elements of civil contempt of a court order are the same for those employed in the professions as for any other citizen. I reject Dr. Whitman’s argument that his actions should be held to a different standard because of his ethical obligations to patients. To the extent Dr. Whitman believed he had “conflicts or problems” complying with a court order enforcing his non-compete, he was duty bound to present those conflicts or problems to the court at the time of the hearings on Dr. Goldberg’s motion for preliminaiy relief.[3] Once the Order issued, Dr. Whitman’s only lawful options (and, indeed, his responsibility) were to seek 1) reconsideration or clarification from the motion judge of the Order on the merits, or 2) an appeal of the Order, if he believed he did not have the ability to comply. Absent success with these procedures, Dr. Whitman was required to comply with the Order.
5. Any oral communications between counsel on the subject of Dr. Whitman’s “winding down” of the practice, not memorialized in the correspondence on record before me, are immaterial to the issues currently before the court, for multiple reasons: 1) it is undisputed on the record before me that a limited winding down — with respect to complex procedures, through at least date of service of the Order — was agreed to; 2) it is similarly undisputed on the record before me that Dr. Whitman unilaterally chose to practice a more expansive view of winding down, which included both routine care for some of his existing patients, and the general practice of dentistry on new patients of Uxbridge up to the date of the contempt filing; 3) I find and rule no contempt began until service of the Order on September 23, 2008; and 4) Dr. Whitman’s testimony alone is sufficient for a finding of contempt. I therefore deny the parties’ offers of proof with respect to testimony by counsel, find that any additional detail from the *294 conversations is not material to Dr. Whitman’s defense, and do not reach Dr. Whitman’s arguments on the question of disqualification.[4]
6. Viewing all of Dr. Whitman’s conduct and decisions in light of the language of the Order, the court finds the Order was more than clear, and that Dr. Whitman knowingly and willfully acted at his peril on his view that the Order did not strictly apply to him absent “clarification” of what he viewed to be his conflicting ethical obligations, a clarification he did not seek from the court following service of the Order upon him. I therefore find Dr. Whitman in contempt of court for his practice of dentistry in Uxbridge from and after September 23, 2008.
7. Dr. Whitman’s contempt is not excused or mitigated by an “inability” defense. I find no Massachusetts authority — outside the statutory context of child support orders in the probate court — for such a defense.
8. Dr. Whitman’s contempt is not excused or mitigated by any reliance he may have placed on his counsel. Mr. Bourgeois’ advice notwithstanding, I find Dr. Whitman is a sophisticated professional who held his own beliefs about the Order, and made his own decisions accordingly.
9. I find no basis in fact or in law for an estoppel defense to the contempt. First, I find and rule, based on all of his trial testimony taken together, that Dr. Whitman had unclean hands between September 12, 2008 and October 3, 2008. I find the representations Dr. Whitman made to his own counsel, and thus authorized counsel to make to opposing counsel, about the scope of his “winding down” dentistry practice in Uxbridge were untrue in material respects. It was not true as of September 29, 2008 that Dr. Whitman was “not seeing patients generally in Uxbridge.” Dr. Whitman was in fact continuing to see general patients of the Uxbridge practice. He was also continuing to see patients of his own for clinical procedures such as fillings, which did not fall into that group of “complex procedures” represented as those being wound down. I find Dr. Whitman knowingly chose to do so, and that he well knew doing so was in violation of the Order, as well as contrary to the representations his counsel was making on his behalf. I therefore rule Dr. Whitman is not entitled to the equitable remedy of an estoppel defense.
10. Even were Dr. Whitman entitled to raise an estoppel defense, I find no acts of Dr. Goldberg or his counsel which would support estoppel. Dr. Goldberg has never taken inconsistent positions before the court on his reading of either the non-compete or the Order. I find on the record before me that Dr. Goldberg merely attempted to extend professional courtesy to Dr. Whitman with respect to a limited “wind-down.” Dr. Goldberg waived no rights of his own by doing so, nor did he lull Dr. Whitman into surrendering exercise of any lawful rights. Once this courtesy was abused, and the unlawful competition continued in a manner which reasonably from Dr. Goldberg’s perspective appeared unabated, the Contempt Complaint was an appropriate response.
11.No evidence was presented of actual monetary loss to Dr. Goldberg proximately caused by the contempt alone, other than the costs and attorneys fees directly associated with the filing and prosecuting of the Contempt Complaint, and I therefore find no other damages are recoverable for the contempt.

(1) The Complaintfor Contempt against Dr. Whitman is ALLOWED, and Dr. Whitman is hereby adjudged in contempt of the Order served upon him on September 23, 2008, beginning on that date and continuing to October 3, 2008.

(2) Dr. Goldberg shall be entitled to reasonable costs and attorneys fees from Dr. Whitman for prosecution of this Complaint for Contempt. Counsel shall file and serve a verified, detailed, and documented fee petition within thirty days of the date of receipt of this Order, addressing only such fees and costs as have been incurred in connection with the Complaint for Contempt before this court. Dr. Whitman shall have 14 days thereafter to oppose the petition, after which date a hearing on the petition shall be held, if necessary, at the sole discretion of the then-sitting “C” session judge.

Questions with respect to other paragraphs of the non-compete were addressed by a prior order dated July 23, 2008.

Specifically, I find and rule I need not hear from the lawyers on such topics as the parties’ understandings as to when the Order took effect; what the “wind-down” would consist of; or whether Mr. Bourgeois correctly understood and communicated to Mr. Stein what Dr. Whitman believed his ethical obligations to be.

Shree other judges of this court were involved at the preliminary stage of the underlying litigation. Neither side has represented to this judge what, if any, arguments or evidence was offered at that time with respect to Dr. Whitman’s ethical obligations to patients, and no transcripts of those proceedings are before me. I thus make no findings with respect to if, or how, this issue was presented. I simply note it was Dr. Whitman’s duly to present the issue to the court before the Order issued.

In this regard I simply note I do not read Steinert v. Steinert, 73 Mass.App.Ct. 287 (2008), as compelling any different result. To the contrary, Steinert supports the proposition that a testifying counsel shall not simultaneously act as an advocate at trial, and that mere speculation as to what the testimony of counsel might add to the mix is insufficient, to compel either testimony or disqualification. In this case both putative testifying counsel were present at counsel table for trial of the Contempt Complaint, and each was observed by the court to be actively participating as an advocate, either by coaching co-counsel (in the case of Mr. Bourgeois), or himself questioning witnesses and arguing to the court (in the case of Mr. Stein).