NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-54

CARMEN HARDY-RONDASH

vs.

CASSIDI HARDY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The parties, Carmen Hardy-Rondash (father) and Cassidi Hardy (mother), were married in 2011.  Four children were born of the marriage between 2012 and 2020.  In June 2019, the father commenced divorce proceedings in the Probate and Family Court. In January 2023, the parties submitted for incorporation into the divorce judgment a "partial divorce agreement" (PDA) resolving several disputed issues.  The remaining issues were tried on August 30 and September 8, 2023, and judgments issued on November 16, 2023 (divorce judgment[1]).  Among other things,

_____

[1] The trial judge issued two identical judgments of divorce nisi separately adjudicating the father's complaint for divorce and the mother's counterclaim for divorce.  For purposes of simplicity, we refer to those judgments collectively as the "divorce judgment."

the divorce judgment required the parties to comply with the terms of the PDA, granted the father sole legal and primary physical custody of the children, made the mother responsible for all transportation during parenting time transitions, ordered the mother to pay weekly child support of $389, and set forth additional provisions concerning the children and the parties' respective therapy-related obligations.

On appeal, the mother challenges (1) certain provisions of the divorce judgment that conflict with the terms of the PDA; (2) the allocation of all transportation responsibilities to her; (3) the amount of child support; (4) certain therapy-related provisions (including one that prohibits her from seeking modification of custody and parenting time unless a category E guardian ad litem previously appointed in the case [GAL] has certified that she has engaged in appropriate therapy); and (5) the judge's decision to limit the length of the trial to two days.[2]  We vacate so much of the divorce judgment that conflicts with the terms of the PDA, assigns all transportation responsibilities to the mother, and prohibits the mother from seeking modification absent the GAL's certification.

_____

[2] The mother is not challenging the judge's calculation of child support arrears, the judge's determination of legal and physical custody, or the parenting plan (apart from the discrete issues raised in her brief with respect to the PDA and the children's transportation).  The mother has also waived her appeal from a related contempt judgment issued in November 2023.

2

The case is remanded for further proceedings consistent with this memorandum and order.  The divorce judgment is affirmed in all other respects.

Discussion.  1.  Partial divorce agreement.  The mother contends that the judge erred by including provisions in the divorce judgment (concerning telephone contact with the children and transportation of the children to extracurricular activities) that directly conflict with provisions of the PDA, which was incorporated into the divorce judgment.  We agree.

With respect to telephone contact with the children, the PDA allowed each parent to call the children once per day when they are in the other parent's care (including Friday, Saturday, and Sunday on alternating weekends).  The divorce judgment, however, departed from the terms of the PDA by (a) restricting the parties' weekend telephone contact to Saturdays only (thereby eliminating Fridays and Sundays), and (b) requiring the mother's telephone contact on Tuesdays and Thursdays to occur at 7 P.M.[3]  The judge did not make any findings explaining the basis for these changes.

With respect to the children's extracurricular activities, the PDA provided, in relevant part, that each party "shall

_____

[3] Both parties' proposed judgments included a specific window of time for the telephone contact to occur:  the mother proposed a window of 6 P.M. to 8:30 P.M., whereas the father proposed a longer window of 4 P.M. to 8:30 P.M.

3

generally be responsible for transporting the children to and from their agreed upon extracurricular activities . . . during his/her respective parenting time" (emphasis added).  The divorce judgment, however, omitted "generally" and "agreed upon" from the preceding sentence and further provided that the parties "shall ensure that the children attend their scheduled practices, games, and events during their respective parenting time."  It appears that these changes were adopted from the father's posttrial amended proposed judgment.  The judge did not explain her reasoning for omitting the language in the PDA that limited the parties' transportation obligations to "agreed upon" extracurricular activities only.  At trial, the mother testified that the father unilaterally enrolled the children in extracurricular activities during her parenting time (either without consulting her or over her objection), often in "inconvenient locations," which reduced her overall time spent with the children and "t[ook] up a lot of [her] parenting time with driving time."  It is unclear whether the judge considered this testimony, as she did not address it in her findings.

The mother contends that the judge erroneously (1) revisited issues previously settled by the parties in the PDA, asserting that "those issues were res judicata"; and (2) entered a divorce judgment that conflicted with the PDA without affording the mother notice and an opportunity to be

4

heard.  We are not persuaded that the telephone contact and extracurricular activities issues were subject to the doctrine of res judicata by virtue of their inclusion in the PDA, given that the PDA was not incorporated into a prior judgment (rather, it was incorporated into the divorce judgment).  See Santos v. U.S. Bank Nat'l Ass'n, 89 Mass. App. Ct. 687, 692 (2016).  However, we agree with the mother that she was deprived of adequate notice and an opportunity to be heard on those issues.

In a June 2023 trial scheduling order (June 2023 order), the trial judge ordered that the PDA "shall be incorporated into the Court's final Judgment."  There was nothing in the June 2023 order, or the parties' pretrial memoranda,[4] indicating that the issues addressed by the PDA remained contested for trial.  See Cavanagh v. Cavanagh, 490 Mass. 398, 426 (2022) ("[O]nce the issues are defined in a final pretrial order, 'they ought to be adhered to in the absence of some good and sufficient reason'" [citation omitted]).  Moreover, based on the record before us, it appears that the father did not seek changes to the PDA until after the trial had already concluded.[5]  Because there was no

_____

[4] The parties' pretrial memoranda included in the record appendix did not identify the PDA, or the specific issues of telephone contact and transportation to extracurricular activities, as contested issues for trial.

[5] At oral argument, the father stated that he sought changes to the PDA in his amended proposed judgment filed after the trial (a copy of which was included in the record appendix), but

5

indication from the judge or the father prior to (or during) the trial that the telephone contact and extracurricular activities issues remained in dispute, the mother was deprived of a meaningful opportunity to be heard and present evidence on those issues.  See Brantley v. Hampden Div. of the Probate & Family Court Dep't, 457 Mass. 172, 187 (2010) ("Due process requires, at minimum, an opportunity to be heard 'at a meaningful time and in a meaningful manner'" [citation omitted]).

In addition to the notice problem, there is a potential enforcement problem.  The language of the divorce judgment is internally inconsistent insofar as it provides that the parties "shall abide by the terms of the [PDA]," yet includes certain provisions that directly conflict with the "terms" of the PDA. It is unclear which provisions are controlling and what the parties' rights and obligations are with respect to telephone contact and transportation of the children to extracurricular activities.  As a result, the conflicting provisions of the PDA and divorce judgment have been rendered unenforceable insofar as a contempt finding cannot be based on ambiguous language.  See Sax v. Sax, 53 Mass. App. Ct. 765, 771 (2002).  A remand is therefore necessary, not only to provide the mother with a

---

he could not recall whether he also sought those changes in his proposed judgment filed on the first day of trial (a copy of which was not included in the record appendix).

6

meaningful opportunity to be heard, but also to allow the judge to redetermine and clarify the parties' rights and obligations with respect to these issues.

2. Transportation during parenting time transitions. The mother contends that the judge abused her discretion by requiring the mother to be solely responsible for the children's transportation during all parenting time transitions without making adequate subsidiary findings in support thereof. We agree.

In or around October 2021, the parties entered into an agreement, which was incorporated into a temporary order, setting forth a temporary parenting plan under which all parenting time transitions would occur at the father's residence. Although the mother agreed to shoulder the entire transportation responsibility on a temporary basis, she sought to share that responsibility with the father on a permanent basis. In April 2022, the parties filed a stipulation identifying as a contested issue for trial the allocation of responsibility for the children's transportation during parenting time transitions. The mother also listed it as a contested issue for trial in her June 2023 pretrial memorandum, stating that she was seeking to have the father share in the transportation responsibilities. The mother reiterated this request in her posttrial amended proposed judgment.

7

During the pendency of the divorce proceedings, the GAL was appointed to, among other things, make recommendations regarding an appropriate parenting plan that would promote the children's best interests.[6]  In his final report submitted in December 2022, the GAL recommended that all parenting time transitions occur at fixed times at a location equidistant between the parties' homes.  At trial, both parties testified regarding the GAL's transportation recommendations.  The father stated that he did not agree with the GAL's recommendations, but did not elaborate as to why.  The mother stated that she agreed with the GAL's recommendations, explaining that she would like more equalized time with the children rather than "spend[ing] so much time in transitions."  The mother also provided examples of how her transportation duties required spending some of her limited parenting time driving.[7]

The judge ultimately ordered all parenting time transitions to occur at either the father's residence or the children's

---

[6] "In addition to investigating and reporting factual data to the court, a Category E GAL develops clinical opinions to assist the judge . . . in making custody and [parenting time] decisions."  Imbrie v. Imbrie, 102 Mass. App. Ct. 557, 561 n.5 (2023).

[7] With respect to picking the three eldest children up from school, the mother testified that they have staggered release schedules, requiring each child to be picked up at a different time between 3:30 P.M. and 4:10 P.M. (despite all three children attending the same school).

8

school, effectively rejecting the GAL's transportation recommendations.  Although a judge is not required to adopt the recommendations of a GAL, see Pizzino v. Miller, 67 Mass. App. Ct. 865, 876 (2006), the reason for rejecting them should be clearly articulated in the judge's findings.  See Ventrice v. Ventrice, 87 Mass. App. Ct. 190, 196 (2015).  Here, "we cannot ascertain why the judge chose not to follow the [transportation] recommendations of the GAL" because she did not address them (or the parties' relevant testimony) in her findings.  Id. Accordingly, the transportation issue must be remanded for reconsideration and entry of further findings reflecting consideration of the GAL's recommendations (and other evidence presented on this issue, including the parties' testimony).  Id. at 196-197.

3.  Child support.  In challenging the amount of child support ordered by the judge, the mother claims error in the judge's (a) calculation under the Child Support Guidelines (guidelines); (b) disparate treatment of the parties with respect to their receipt of financial assistance from household and family members; and (c) failure to consider factors mitigating against increasing the mother's prior support obligation of $309 per week (established by a temporary order in 2020), including changes in the parties' respective incomes and the birth of the mother's fifth child (fathered by the mother's

9

current partner) in 2021.  For the reasons that follow, we are not persuaded.

We review a judge's determination of child support for an abuse of discretion.  See Cavanagh, 490 Mass. at 417.  "[T]he method for calculating . . . child support is governed both by statute, see G. L. c. 208, § 28, and by the [guidelines].  Although the guidelines have been subject to periodic revision since their enactment, an essential premise has remained constant:  that child support should be calculated as a percentage of parental income" (quotations and citations omitted).  Emery v. Sturtevant, 91 Mass. App. Ct. 502, 507-508 (2017).

With respect to the parties' incomes at the time of trial, the judge found that the mother was earning a total of $1,023.85 per week ($903.85 as a sports program manager and $120 as a part-time umpire coordinator[8]), and the father was earning a

_____

[8] The mother asserted on her financial statement that she expected her position as a part-time umpire coordinator to end in October 2023; however, she did not provide any testimony or documentary evidence supporting that assertion.  Given the lack of supporting evidence presented by the mother, we discern no error in the judge's decision to include her part-time income in the child support calculation.  In light of this conclusion, we are unpersuaded by the mother's contention that the $389 per week child support order is improper because it amounts to more than forty percent of her gross income from her primary job (after adding her part-time income, the order amounts to approximately thirty-eight percent of her total income).  See Child Support Guidelines § IV(C) (Oct. 2021, as amended Jul. 2023).

10

total of $1,095.82 per week ($1,027.17 as a special programs coordinator and $68.65 as a part-time wrestling coach).[9]  These income figures found by the judge were also reported on the parties' financial statements submitted at trial.

In her findings pertaining to child support, the judge stated that she would "use the incomes listed on each party's financial statement, the parties submitted child support guidelines [worksheets] using the income identified on the financial statements filed at the time of trial.  The child support [order] that results from application of the guidelines to this income is $389 per week."  The mother contends that this finding is clearly erroneous insofar as the worksheets submitted by the mother and the father showed presumptive child support orders of $351 and $354 per week, respectively.  The mother fails to acknowledge, however, that those worksheets only included the parties' incomes from their primary jobs, entirely omitting their part-time incomes.  Applying the guidelines to the parties' total incomes as found by the judge (from both primary and part-time employment) results in a presumptive child

---

[9] The judge also found that the father was receiving SNAP benefits of $188.14 per week, which cannot be considered for purposes of calculating child support.  See Child Support Guidelines § I(A) (Oct. 2021, as amended Jul. 2023).

11

support order of $389 per week.[10]  Accordingly, we discern no error in the judge's calculation of support pursuant to the guidelines.

Insofar as the mother claims the judge unfairly treated her partner's contribution of $500 per week toward her legal fees as income for purposes of child support (while omitting similar assistance received by the father from his family), it is apparent from the amount of child support actually ordered by the judge that neither party's receipt of financial assistance was included in the child support calculation.[11]  Moreover, although the judge acknowledged the mother's receipt of financial assistance from her partner, nowhere in her findings did she state that the partner's contributions would be treated as income for purposes of calculating child support.  We are likewise unpersuaded that the judge failed to consider changes in the parties' incomes between the time of the 2020 temporary order (which set child support at $309 per week) and the 2023

---

[10] It is apparent that the judge rounded down (rather than up) when entering the parties' income figures into the guideline's worksheet.  Using rounded-down weekly income figures of $1,095 for the father and $1,023 for the mother (with no insurance deductions or childcare credits) yields a presumptive order of $389 per week.

[11] To illustrate, if the judge had added $500 per week to the mother's income (increasing her total weekly income to approximately $1,523), the resulting presumptive child support order would have been $550 per week.

trial,[12] given that the $389 per week support order was calculated using the parties' current incomes at the time of trial.

Turning to the mother's remaining claim that the judge abused her discretion in setting child support without considering the mother's financial obligations to her fifth child, we conclude that the mother did not adequately present this issue below.  She did not identify this as a contested issue for trial in her June 2023 pretrial memorandum.  Instead, she raised it for the first time in her amended proposed judgment submitted after the trial, asking the judge to set child support at $309 -- below the presumptive guidelines amount -- which she asserted would "effectively allocate $45 per week for support of [her fifth] child."

"When an initial order . . . is sought for a child covered by the order in the case under consideration, a hypothetical amount of child support for a child with whom the parent resides but for whom no child support order exists shall be deducted from the gross income of the parent."  Child Support Guidelines § II(K)(3) (Oct. 2021, as amended Jul. 2023).  "The parent seeking the deduction must provide sufficient proof of the legal obligation to support the child and of the gross income of that

_____

[12] The mother previously had been earning around $72,000 per year (approximately $1,385 per week) as a public school teacher.

13

child's other parent."  Id.  See G. L. c. 208, § 28; Department

of Revenue v. Mason M., 439 Mass. 665, 672 (2003).[13]  "The burden

is on the parent who seeks to deduct a hypothetical amount to

provide to the Court the information necessary for calculating

the hypothetical amount, including the non-party parent's gross

income."  Child Support Guidelines § II(K), commentary 2017

(Oct. 2021, as amended Jul. 2023).  Here, the mother failed to

provide sufficient proof to calculate the hypothetical amount

(namely, the gross income of her fifth child's father).  We

therefore discern no error in the judge declining the mother's

request to reduce the support order based on her financial

obligations to her fifth child.[14]

---

[13] "When a [judge] makes an order for maintenance or
support, the [judge] shall determine whether the obligor . . .
is responsible for the maintenance or support of any other
children . . . even if a court order for such maintenance or
support does not exist . . . ."  G. L. c. 208, § 28.  "If the
[judge] determines that such responsibility does, in fact, exist
and that such obligor is fulfilling such responsibility such
[judge] shall take into consideration such responsibility in
setting the amount to [be] paid under the current order for
maintenance or support."  Id.

[14] The mother argues that that the judge should have
considered her fifth child as basis for not increasing her
support obligation from the temporary order amount of $309,
relying on section II(K)(4) of the guidelines.  That section,
however, is inapplicable here because it pertains to
modification proceedings.  See Child Support Guidelines
§ II(K)(4) (Oct. 2021, as amended Jul. 2023) ("Obligations to a
subsequent family may be used as a defense to a request to
modify an order seeking an increase in the existing order, but
such obligations should not be considered a reason to decrease
an existing order" [emphasis added]).

14

4. _Therapy-related provisions_.  The divorce judgment ordered the mother to "obtain an experienced and seasoned psychotherapist who specializes in domestic violence with female perpetrators . . . and anger management," among other things. This provision largely adopted the GAL's recommendations.  The divorce judgment further ordered the mother to "attend a Massachusetts Trial Court approved batterers program and anger management course with in-person sessions" and "provide proof of completion to [the] [f]ather."  The judgment also prohibited the mother from seeking modification of custody or parenting time "until the GAL can certify that [she] has engaged in appropriate therapy for the issues outlined in [the GAL's] reports and this [j]udgment."[15]  The mother contends that these therapy-related provisions are too vague and onerous, unfairly require her to reenroll in programs that she has already completed, and improperly make the GAL the gatekeeper of any future request for modification.

With the exception of the gatekeeper provision, as discussed _infra_, we discern no error in the therapy-related provisions of the divorce judgment.  They are amply supported by both the judge's subsidiary findings and evidence in the record. The judge made many findings describing the parties' tumultuous

_____

[15] This gatekeeping provision was not part of the GAL's therapy-related recommendations.

15

relationship plagued by explosive confrontations that often occurred in the children's presence.  The judge found that the mother had been physically abusive to the father, subjected the children to highly inappropriate "diatribe[s]" about the father, and exhibited "out-of-control behavior [in] total disregard [of] the best interests of the children."  The judge credited the father's testimony about the mother's abuse, and found there to be "overwhelming, credible evidence of [the] [m]other's uncontrollable anger [and] lack of self-control."  The judge found that the mother had exhibited "no insight into the detrimental effect of her behavior," had denied or minimized responsibility for her actions, and had not been candid with past mental health providers (in both individual therapy and a batterers' program she attended in 2020) regarding her role as a perpetrator of domestic violence.  The judge further found that the mother was not actively engaged in therapy at the time of trial, the mother had not previously received therapy consistent with the GAL's recommendations, and "without proper therapy to address [her] behavior, . . . the children remain[ed] at risk while in the [m]other's care."  Accordingly, we discern no abuse of discretion in the judge's decision to adopt the GAL's therapy-related recommendations and require the mother to complete new batterers' treatment and anger management programs.

However, we conclude that it was improper to make any future request by the mother to modify custody or parenting time contingent on the GAL's certification that she has engaged in appropriate therapy. The GAL was first appointed in a June 2019 order, which appointment concluded after he submitted two reports in January 2020 and June 2020. The GAL was thereafter reappointed in an April 2022 order for the purpose of updating his June 2020 report. He filed his final report in December 2022, completing the duties specified in the April 2022 reappointment order. Because the June 2019 and April 2022 appointment orders did not direct the GAL to certify the mother's compliance with the therapy-related provisions of the divorce judgment, providing such a certification would exceed the scope of those appointments.[16] See Probate and Family Court Standing Order 1-08(1) (2008) ("The GAL performs duties that are within the scope of the court order of appointment"). Moreover, to the extent that the gatekeeper provision may improperly shift judicial authority to the GAL to decide whether the mother is eligible to seek relief from the Probate and Family Court, it cannot stand. See Bower v. Bourney-Bower, 469 Mass. 690, 706-707 (2014); Silverman v. Spiro, 438 Mass. 725, 736-737 (2003). Accordingly, we vacate so much of the divorce judgment that

_____

[16] The trial docket does not show any further orders reappointing the GAL.

17

prohibits the mother from filing a complaint for modification of custody or parenting time until the GAL can certify that she has engaged in appropriate therapy.

5. <u>Length of trial</u>. Finally, the mother asserts that the judge abused her discretion by issuing the June 2023 order that reduced the number of scheduled trial days from four to two, thereby hampering the mother's ability to present sufficient evidence on several issues. While we are not persuaded by the father's contention that the mother waived this issue,[17] we

---

[17] The father contends that it was incumbent on the mother to object to the June 2023 order or to request more time during the trial, neither of which she did. The mother, however, plausibly asserts that she did not believe the judge would entertain such a request in light of a provision in the June 2023 order stating that "NO FURTHER MOTIONS OR COMPLAINTS SHALL BE FILED WHILE THE TRIAL IS PENDING INCLUDING MOTIONS FOR PERMISSION TO FILE." The June 2023 order carved out a narrow exception for "motions in limine, motions to preclude, and any other motion normally heard . . . immediately prior to the commencement of trial," with the caveat that such motions must be "presented at least 14 days prior to the [t]rial . . . with sufficient time for them to be scheduled [for hearing] in the normal course." The mother filed several motions in limine approximately one month prior to trial in accordance with the June 2023 order; however, the judge refused to entertain the motions because the mother was unable to mark them for hearing prior to trial as no hearing dates were available. Accordingly, we cannot fault the mother for not requesting additional time where making such a request would have seemingly violated the filing ban set forth in the June 2023 order, and the judge did not otherwise exhibit any willingness to entertain such a request. Contrast <u>Babaletos</u> v. <u>Demoulas Super Markets, Inc</u>., 493 Mass. 460, 467-468 (2024) (no abuse of discretion where trial judge expressed willingness to consider requests for more time, and appellant failed to make such request). Finally, while we are mindful that trial judges require broad discretion to manage their extraordinary caseloads, we think the filing

18

nevertheless conclude that the mother has not identified how the reduced trial time affected the issues that she has raised on appeal.[18]  Although the mother claims she was prejudiced by having insufficient time to call the GAL as a witness for the purpose of challenging his therapy-related recommendations, among other things, she concedes that she "did not have the financial ability to call the GAL to testify at trial."  She has therefore failed to demonstrate that, but for the trial scheduling order, she would have called the GAL as a witness.

Conclusion.[19]  Paragraphs 9, 12, 21, and 23 of the judgments of divorce nisi dated November 16, 2023, are vacated.  The case is remanded to the Probate and Family Court for further proceedings consistent with this memorandum and order.  The

_____

restrictions contained in the June 2023 order exceeded the bounds of that discretion.  Although a limited filing order may be appropriate in some circumstances, see State Realty Co. of Boston v. MacNeil, 341 Mass. 123, 124 (1960) (judge has inherent discretion to issue limited filing order to put "a stop to harassing, vexatious, and repetitive litigation"), we do not see any obvious justification for it on the record before us and, even if such justification were apparent, the filing restrictions here are so extreme that they run the risk of improperly restricting the parties' access to the court.

[18] We reject the mother's remaining contention -- that the judge ignored "significant unrebutted evidence" regarding the father's alleged infidelity and a pending criminal charge -- on similar grounds.  The mother has failed to demonstrate how that evidence has any bearing on the issues raised in this appeal.

[19] The father's request for appellate attorney's fees is denied.

19

judgments are affirmed in all other respects.  During the pendency of the remand, paragraphs 9, 12, and 21 of the November 16, 2023 judgments shall remain in effect as a temporary order, unless otherwise ordered by the judge.

> So ordered.
>
> By the Court (Rubin, Hand & Smyth, JJ.[20]),
>
> Paul Little
>
> Clerk

Entered:  November 10, 2025.

---

[20] The panelists are listed in order of seniority.